**PUBLISH**

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 14 2000**

**PATRICK FISHER**
**Clerk**

WILLIAM I. KOCH; OXBOW
ENERGY, INC.; L. B. SIMMONS
ENERGY, INC., doing business as
Rocket Oil Company; SPRING
CREEK ART FOUNDATION INC.;
GAY A. ROANE; ANN ALSPAUGH;
THE NORTHERN TRUST
COMPANY, as trustee; PAUL
ANTHONY ANDRES COX; HOLLY
A.A.C. FARABEE; RONALD W.
BORDERS; FREDERICK R. KOCH;
THE FIDUCIARY TRUST
COMPANY INTERNATIONAL,

        Plaintiffs-Appellants,

and

UNITED STATES TRUST
COMPANY OF NEW YORK, as
trustee; MARJORIE SIMMONS
GRAY, as trustee; MARJORIE L.
SIMMONS, as trustee;
NATIONSBANK N.A., co-trustee of
the Louis Howard Andres Cox Trusts
B & D,

        Plaintiffs,

No. 98-3223

v.

KOCH INDUSTRIES, INC.;
CHARLES G. KOCH; STERLING V.
VARNER; DAVID H. KOCH;
DONALD L. CORDES; THOMAS M.
CAREY,

      Defendants-Appellees.

---

Appeal from the United States District Court
for the District of Kansas
(D.C. No. 85-1636 )

---

Arthur R. Miller, Cambridge, Massachusetts, (Fred H. Bartlit, Jr., Donald E. Scott, Ellen A. Cirangle, Ryan D. Downs, Glen E. Summers, of Bartlit, Beck, Herman, Palenchar & Scott, Denver, Colorado, Attorneys for Plaintiffs-Appellants William I. Koch, Oxbow Energy, Inc., Northern Trust Company and Spring Creek Art Foundation; Harry L. Najim, of Najim Law Offices, Wichita, Kansas; Russell E. Brooks, Eugene F. Farabaugh, of Milbank, Tweed, Hadley & McCloy, New York, New York, Attorneys for Plaintiffs-Appellants Frederick R. Koch and The Fiduciary Trust Company International; Gregory S. C. Huffman, L. James Berglund, II, Christopher L. Barnes, of Thompson & Knight, P.C., Dallas, Texas, Attorneys for Plaintiffs-Appellants L. B. Simmons Energy, Inc. d/b/a Rocket Oil Company, Gay A. Roane, Ann Alspaugh, Paul Cox, Holly Farabee and Ronald Borders, with him on the briefs).

Robert L. Howard, of Foulston & Siefkin L.L.P., Wichita, Kansas (James M. Armstrong, James D. Oliver, and Timothy B. Mustaine with him on the briefs) for Appellees.

---

Before **EBEL, McWILLIAMS,** and **MURPHY,** Circuit Judges.

---

**MURPHY,** Circuit Judge.

-2-

## I. INTRODUCTION

In June of 1983, a group of Koch Industries, Inc. ("KII") stockholders entered into a Stock Purchase Agreement ("SPA") with KII. Under the SPA, the selling stockholders (the "Plaintiffs"), who owned 47.8% of KII stock, received $200 per share, a total value of approximately $1.1 billion. Two years later, the Plaintiffs sued KII and individual KII officers (the "Defendants"), claiming the Defendants misrepresented and omitted material facts during the negotiation of the SPA, which resulted in the Plaintiffs' undervaluation of KII stock. Thirteen years later, the case finally went to trial. Following an eleven week trial, a jury returned a verdict in favor of the Defendants. The Plaintiffs now appeal a host of district court rulings, made both prior to and during trial.

Specifically, the Plaintiffs challenge the district court's summary judgment ruling; its construction, application, and unwillingness to vary the terms of the pretrial order; various evidentiary rulings; jury instructions on state law claims; the district court's restrictions on the Plaintiffs' fraud claims; its limitation of damages; and, generally the trial court's administration of this litigation. With the exception of the district court's jury instructions on two fraud claims premised on Texas state law, this court **affirms** the judgment of the district court.

## II. BACKGROUND

A. Factual Background

The subject of this dispute, KII, is the second largest privately-held corporation in the United States. Based in Wichita, Kansas, KII owns an array of energy-related operations in the United States and Canada. Specifically, KII's assets include oil refineries, service stations, pipelines, coal mines, oil and gas exploration properties and processing plants, and a fleet of trucks. KII also owns numerous ranches and several hundred Chrysler dealerships.

Originally named the Rock Island Oil and Refining Company, KII was founded by Fred C. Koch, the father of plaintiffs William and Frederick Koch and defendants Charles and David Koch. Fred Koch launched the company after World War II, when his mentor, L.B. Simmons, sold a refinery and several pipelines to Fred. In exchange, L.B. Simmons received stock and cash and he soon purchased additional shares of Rock Island Oil and Refining.

L.B. Simmons' stock eventually passed individually and in trust to the following plaintiffs: Gay Roane, Holly Farabee, and Ronald Borders (the "Texas Plaintiffs"), Ann Alspaugh, Paul Cox, and L.B. Simmons Energy, Inc. (collectively, the "Simmons Family"[1]). For decades, the Simmons Family elected

_____

[1] The "Simmons Family" includes the Texas Plaintiffs as well as Alspaugh, Cox, and L.B. Simmons Energy, Inc.

-4-

a director to KII's Board of Directors. Those members of the Simmons family involved in the instant suit are cousins to the four Koch brothers.

In 1966 and 1967, Fred Koch gave all his common shares of KII stock to trusts created for his four sons, granting equal shares to plaintiff William and defendants Charles and David, but a lesser amount to plaintiff Frederick. When Fred Koch died in 1967, Charles succeeded his father as a director and chief executive officer of KII, positions he retains today. David went to work for KII in 1970 and presently serves as an executive vice-president and a director. William joined KII full-time in 1974, becoming vice president of corporate development five years later and continuously serving as a director from 1967 to 1983. Frederick, however, displayed substantially less interest in the company; he was never a KII employee and did not place a representative on the board until March of 1981.

In 1980, a dispute erupted over the management of KII, pitting William, Frederick and the Simmons Family against Charles and David. During this contentious power struggle, Charles and David purchased the 4 % of KII stock owned by Howard Marshall III, the son of director J. Howard Marshall II. As a result, the voting percentage of stock retained by William, Frederick and the Simmons Family stood at 47.8 %, while Charles, David and the family of J.

Howard Marshall II controlled 49.7 %, with employees and others owning the balance. In addition, the Board voted to terminate William's employment at KII.

At that point, KII began negotiating with William, Frederick and the Simmons Family either to buy back some or all of their stock or to take KII public and have the now dissident shareholders sell their stock on the public market. Both sides then retained law firms and investment banking companies to represent them in the negotiations. On behalf of the dissident shareholders, the investment banking firm Goldman Sachs undertook an extensive valuation study of KII, beginning in the spring of 1982.

These efforts culminated in the June 1983 SPA. Signed by all parties on June 4, 1983, the SPA provided that William, Frederick and the Simmons Family would sell their shares of KII common stock back to the company for $200 per share. In addition, the selling shareholders received their pro rata interests in an offshore oil concession. The SPA contained two relevant warranties by KII: The first provided that all KII financial statements disclosed to the selling shareholders had fairly presented KII's financial condition and were prepared in accordance with generally accepted accounting principles. The second warranty promised that since December 31, 1982, the Defendants had provided all information "which if fully disclosed might materially affect the valuation of [KII] stock . . . ."

B. Procedural Background

In June of 1985, two years after signing the SPA, the selling shareholders filed suit, claiming the Defendants had misrepresented or failed to disclose material facts which, if properly provided, would have increased the Plaintiffs' valuation of KII stock at the time of the SPA. Specifically, the complaint detailed three alleged misrepresentations concerning KII's oil and gas properties in the Persian Gulf, Utah, and North Dakota and further alleged a general scheme to conceal the true value of KII stock. The Plaintiffs asserted federal claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5, and state claims for breach of fiduciary duty, breach of warranty, and fraud. They requested actual damages of over $2 billion. The Defendants named in the action were KII; Charles and David Koch; Sterling Varner, the president and a director of KII; Tom Carey, KII's vice president of finance; and Donald Cordes, KII's vice president of legal affairs.

On November 5, 1986, the district court granted summary judgment in favor of the Defendants on the Persian Gulf and Utah claims, but denied summary judgment on the North Dakota claim. The district court also determined the Plaintiffs' allegation of a general scheme to conceal the value of stock failed to meet the particularity requirement of Rule 9(b) of the Federal Rules of Civil Procedure. After several failed attempts to bring the excluded claims before other

fora,[2] in 1989 the Plaintiffs persuaded the district court to grant them leave to

amend their complaint, adding both general and specific allegations of fraudulent

accounting policies and practices. Based on this amended complaint, the

---

[2] The Plaintiffs first filed a motion for reconsideration of the grant of summary judgment and a motion for leave to amend their complaint to meet Rule 9(b)'s particularity requirement, but the district court denied these two motions. The Plaintiffs then unsuccessfully petitioned this court for a writ of mandamus compelling the district court to vacate the order denying them leave to amend. *See Koch v. Koch*, 1988 WL 130669, at *2 (D.Kan., Nov. 4, 1988). Later that year, the Plaintiffs brought a separate suit before another judge of the United States District Court for the District of Kansas, again alleging fraud and misrepresentation regarding the SPA. *See Oxbow Energy, Inc. v. Koch Indus., Inc.*, 686 F.Supp. 278, 279-80 (D.Kan. 1988). The district court, however, granted summary judgment to the Defendants, because it "required [the Plaintiffs] to bring all claims of misrepresentation arising out of the [SPA] in one action." *Id.* at 282. In that order, the district court stated,

> [T]he court cannot condone plaintiffs' practice of running to a different city within the district and filing a new case every time a judge in a prior action makes a ruling adverse to that litigant's position. The court cannot be made a party to what is in effect an appeal from Judge Crow's ruling in the 1985 action.

*Id.* Finally, in 1988, in a suit brought by Charles and David Koch against William Koch requesting specific performance of a sales contract concerning a coin collection and real property, William counterclaimed, alleging he was excused from performance due to Charles' and David's misrepresentations regarding the SPA. *See Koch*, 1988 WL 130669, at *1-*2. Yet a third judge of the same district court dismissed William's counterclaim as precluded by the summary judgment order issued in *Oxbow Energy, Inc. v. Koch Indus., Inc. See Koch*, 1988 WL 130669, at *3-*4. After reciting the above quoted language from the *Oxbow Energy* summary judgment order, the district court concluded, "This counterclaim is the third vehicle which defendant has used to raise the same issues . . . . This court is even more emphatically unwilling to overrule the clear decisions of two learned brothers." *Id.* at *4.

Plaintiffs then sought broad discovery from several non-parties, requests which a magistrate judge and the district court strictly limited.

In 1993, the district court closed discovery. The Defendants then filed a motion for summary judgment on all of the remaining claims. On July 11, 1997, the district court issued its order, granting summary judgment to the Defendants on several of the Plaintiffs' claims. The district court, however, denied summary judgment on one of the Plaintiffs' accounting claims, which alleged the Defendants failed to disclose that certain expenses were "unusual or infrequently occurring." In addition, the district court preserved the Plaintiffs' claims that the Defendants withheld information about two expansions of KII's Pine Bend Refinery in Minnesota. Just prior to trial the district court further ruled that Texas law governed the Texas Plaintiffs' state law fraud claims.

In 1998, an eleven week jury trial proceeded on the accounting and Pine Bend claims. The jury eventually returned a verdict in favor of the Defendants. With respect to the Pine Bend claims, the jury found that the Defendants had withheld information but that their misrepresentations or omissions were not material. It also found the Defendants had not breached their fiduciary duty, because they disclosed all material facts and KII had paid a fair price for the stock. On the accounting claim, the jury found the expenses at issue were not infrequently occurring as defined by generally accepted accounting principles.

The Plaintiffs, including the Texas Plaintiffs, now challenge a litany of district court rulings issued both before and during the trial. This court exercises jurisdiction pursuant to 28 U.S.C. § 1291 and **affirms in part** and **reverses in part**.

## III. DISCUSSION

### A. Pine Bend Claims

The Plaintiffs challenge two district court rulings relating to their claims that, prior to the SPA, the Defendants withheld information about expansion plans for KII's Pine Bend Refinery. First, the Plaintiffs argue the district court improperly granted summary judgment against the Plaintiffs on their claim that the Defendants did not disclose KII's plans to expand the refinery to a crude processing capacity of 175,000 barrels per day ("B/D"). Second, the Plaintiffs assert the district court erred by denying their motion to amend the Pretrial Order to conform to evidence at trial indicating that just prior to the SPA, KII had plans to increase the refinery's capacity to 200,000 B/D.

#### 1. Summary Judgment on the 175,000 B/D Claim

In a 1993 Pretrial Order,[3] the Plaintiffs asserted the following claim:

---

[3] Although this 1993 Pretrial Order is not dated, file-stamped, or signed by the District Judge, and does not set a date for the pretrial conference, the parties

(continued...)

> As of the date of the stock sale, defendants knew but did not inform the selling shareholders that KII already was increasing, and *making plans* for further increasing, the crude processing capacity of the Pine Bend Refinery <u>to</u> approximately 145,000 B/D by June 1983; <u>to</u> approximately 155,000 B/D by the end of 1983; and <u>to</u> approximately 175,000 B/D within the next two years thereafter. . . . Defendants' plans included delivering and selling the increased Pine Bend output into existing and new market territories to be accessed more effectively by the reversal of the direction of flow of the Williams Pipeline and by other means.

1993 Pretrial Order, 9-10 (italics added) (underline in original). The Plaintiffs sought to recover for these alleged omissions under the following legal theories: (1) breach of contractual warranty; (2) breach of fiduciary duty; (3) common law fraud; and (4) securities fraud. *See id.* at 16.

The Defendants moved for summary judgment on each of the 145,000, 155,000, and 175,000 B/D claims. The district court denied summary judgment

---

[3](...continued)
appear to have treated this proposed order as defining their claims and defenses for purposes of the summary judgment motion. This court will similarly treat the 1993 Pretrial Order.

After the district court issued its summary judgment order in 1997, the parties drafted a new pretrial order ("the 1998 Pretrial Order") which reflected the determinations made at summary judgment. Thus, the 1998 Pretrial Order looks much like the 1993 Pretrial Order, except that it does not include those claims which the district court had ruled insufficient as a matter of law. This 1998 Pretrial Order, which was subjected to the formalities normally required for such orders, constituted the final pretrial order prior to trial and was used to measure the dimensions of the trial. *See infra* note 9.

on the 145,000 and 155,000 B/D claims, allowing those claims to go to trial, but granted the Defendants' motion on the 175,000 B/D claim.

In its summary judgment order, the district court first posed the issue in these terms: "Is there enough evidence from which a reasonable jury could find that as of June of 1983 KII had *firm plans* to expand Pine Bend's capacity to 175,000 bpd within two years?" Summary Judgment Memorandum and Order, July 11, 1997, at 127-28 (emphasis added). In answering this question, the district court went on to rule,

> The court believes a reasonable jury could not find that the defendants in June of 1983 had *reasonably firm or definite plans* to expand Pine Bend's capacity to 175,000 bpd within two years. At most, the evidence sustains the inference that [KII] officials believed in early 1983 that the economic forecasts and other projections were sufficiently favorable that they should reconsider now increasing refinery capacity under two previously defined cases. . . . The plaintiffs do not submit any evidence from which one can reasonably infer that as of the SPA the defendants *had already decided on a specific schedule* for expanding refinery capacity regardless of [the engineering firm] Litwin's engineering results and cost summaries. Instead, the evidence overwhelmingly indicates that the defendants remained uncertain about the timing, amount and type of any expansion and that any decision to expand remained contingent on among other things, Litwin's results. The mere decision to consider refinery expansion and to set parameters for estimating costs is not what the plaintiffs allege in this claim. They allege that the defendants *planned* to expand the refinery to 175,000 bpd within two years. Quite simply, the plaintiffs do not come forth with the evidence to sustain this allegation of "planned" expansion.

*Id.* at 128-29 (emphasis added).

The Plaintiffs appeal this decision on two grounds. First, the Plaintiffs contend the district court erroneously required evidence of "firm" or "definite" plans, even though neither the Plaintiffs' claim in the Pretrial Order nor the controlling law on any of their legal theories uses those terms. Second, the Plaintiffs assert that a reasonable jury could find that the evidence supported the exact claim articulated in the Pretrial Order, i.e., KII was "making plans" for a 175,000 B/D expansion.

This court reviews a district court's grant of summary judgment *de novo*. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1175 (10th Cir. 1999). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir.), *cert. denied*, 120 S.Ct. 53 (1999). This court has held that failure of proof of an essential element renders all other facts immaterial. *See Treff v. Galetka*, 74 F.3d 191, 195 (10th Cir. 1996). Thus, to succeed on summary judgment on the 175,000 B/D claim, the Defendants must demonstrate that no material facts

regarding this claim, or at least regarding any essential element of the claim, are in dispute and that these undisputed facts fail to prove as a matter of law any essential element of the claim.

In *Air-Exec Inc. v. Two Jacks Inc.*, this court noted that when parties to a lawsuit fail to object to or move to amend a pretrial order, that order "measures the dimensions of the lawsuit both in the trial court and on appeal." 584 F.2d 942, 944 (10th Cir. 1978); *see also* Fed. R. Civ. P. 16(e) (the pretrial order "shall control the subsequent course of the action unless modified by a subsequent order"). For purposes of summary judgment, therefore, the pretrial order coupled with the governing law establish the quantum of evidence required for the Plaintiffs to survive the Defendants' summary judgment motion on the 175,000 B/D claim.

In the 1993 Pretrial Order, the Plaintiffs asserted KII was "making plans" to expand the refinery's crude capacity to 175,000 B/D by the end of 1985. As this order plots the dimensions of the Plaintiffs' claim, they must reference sufficient record evidence for this court to conclude a reasonable jury could find KII was "making plans" for this 175,000 B/D expansion by the end of 1985. Additionally, although each of the Plaintiffs' four legal theories impose upon the

Defendants slightly different disclosure standards,[4] this court can look to the least burdensome of these standards to determine whether any of the claims should have gone to trial. Among these four slightly different disclosure standards, the least rigorous for the Plaintiffs is that flowing from their breach of warranty claim. Thus, in order for even the warranty claim to survive summary judgment, this court, viewing the evidence before the district court at summary judgment in a light most favorable to the Plaintiffs, must answer the following three questions in the affirmative. (1) Could a reasonable jury find that at the time of the SPA, KII was making plans to expand Pine Bend's crude refining capacity to 175,000

---

[4] Due to the terms of the SPA, the breach of warranty claim requires the Plaintiffs to prove a failure to disclose any "event, condition, or state of facts . . . which if fully disclosed *might* materially affect the valuation of stock of [KII] by a prudent and knowledgeable investor . . . ." SPA, § 5(d) (emphasis added). Under their breach of fiduciary duty claim, the Plaintiffs must demonstrate that the Defendants withheld some facts affecting the value or price of stock or any other matters which *would* tend to increase the value of the corporation's stock. *See Sampson v. Hunt*, 564 P.2d 489, 492 (Kan. 1977). The common law fraud claim requires the Plaintiffs to show KII *knowingly or recklessly* withheld information to which a reasonable person *would* attach importance in determining at what price to sell KII stock, and that Plaintiffs did in fact rely on this non-disclosure to their detriment. *See McGuire v. Gunn*, 300 P. 654, 656 (Kan. 1931) (defining common law fraud); *Griffith v. Byers Constr. Co.*, 510 P.2d 198, 205 (Kan. 1973) (establishing when an omission or non-disclosure constitutes a material fact for purposes of common law fraud). Finally, to succeed on their securities fraud claim, the Plaintiffs must show a *substantial likelihood* the non-disclosed information *would* have been viewed by a reasonable investor as having significantly altered the total mix of information made available. *See* 17 CFR § 240.10b-5 (defining securities fraud under Rule 10b-5 of the Securities Exchange Act of 1934); *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988) (establishing when a fact is material under 10b-5).

B/D by the end of 1985? (2) If so, did KII withhold this information from the Plaintiffs prior to the SPA? (3) Might knowledge of this information materially affect the valuation of KII stock by a prudent and knowledgeable investor?

Without needing to address the last two of these three inquires, this court concludes that a reasonable jury could not have found KII was making plans for a 175,000 B/D expansion at the time of the SPA. In reaching this determination, we have reviewed all of the record evidence which might support the Plaintiffs' claim, though this court is not obligated to locate or inspect materials not referenced by the parties in their briefs.[5] *See Adler v. Wal-Mart Stores*, 144 F.3d 664, 672 (10th Cir. 1998); *see also Gamble, Simmons & Co. v. Kerr-McGee Corp.*, 175 F.3d 762, 773 n.5 (10th Cir. 1999) ("In the absence of sufficient citation to record support for a party's allegations, we decline to search for the proverbial needle in a haystack.").

The crux of the Plaintiffs' 175,000 B/D expansion claim is this: as far as the Plaintiffs knew, at the time of the SPA the Pine Bend Refinery utilized two crude units, No. 1 having a capacity of approximately 40,000 B/D and No. 2 having a capacity of approximately 90,000 B/D, for a total capacity of approximately 130,000 B/D. Unbeknownst to the Plaintiffs, however, KII was in

_____

[5] Attached as an appendix to this opinion is a detailed list and discussion of the relevant evidence. *See infra* Appendix.

-16-

the process of revamping unit No. 2 to a capacity of 110,000 B/D, while also working with Litwin Engineering ("Litwin") either to expand No. 1 to a 65,000 B/D capacity or to replace No. 1 with a new unit with a 65,000 B/D capacity. The Litwin project, combined with the revamp of unit No. 2, would allegedly result in a total capacity of 175,00 B/D, all of which information the Plaintiffs claim the Defendants hid from them prior to the SPA.

In opposing summary judgment on the 175,000 B/D claim, the Plaintiffs also rely heavily upon evidence that KII had struck a deal with the Williams Pipeline Company to reverse the flow of the Williams pipeline, but failed to inform the Plaintiffs of that agreement. The Plaintiffs maintain that the Williams reversal provided KII access to new markets for gasoline, thus indicating a plan to increase crude production capacity to 175,000 B/D. Evidence of general market expansion, however, does not specifically support the Plaintiffs' discrete claims for crude production expansion to 145,000; 155,000; 175,000; or 200,000 B/D. Indeed, to succeed on each of these claims, the Plaintiffs must direct this court to evidence of distinct plans to expand production capacity to each specifically alleged number of barrels per day, independent of evidence demonstrating efforts to expand general markets. When the Plaintiffs' stated claims so discretely reference 145,000 B/D, 155,000 B/D, and 175,000 B/D and further include anticipated dates of accomplishment for each expansion, they must provide

evidence differentiating between the three claims. With respect to the 175,000

B/D claim, therefore, the Plaintiffs need to demonstrate evidence of the alleged

plan through Litwin to expand Pine Bend's crude production capacity to 175,000

B/D.[6]

Viewing the relevant evidence in a light most favorable to the Plaintiffs,

this court concludes that a reasonable jury could not find that prior to the SPA KII

was making plans to expand Pine Bend's crude production to 175,000 B/D. At

most, KII was merely contemplating this expansion possibility. Although the

evidence does not reveal definitively whether KII ever contracted with Litwin to

conduct design and cost studies for this possible expansion, this court concludes

that a reasonable jury could infer such a contract existed and even that Litwin

performed this work. What a reasonable jury could not find, however, is that

---

[6] The Appendix to this opinion, therefore, does not include any evidence of the alleged secret deal to reverse the Williams pipeline. *See infra* Appendix. The summary judgment order did not in fact preclude introduction of such evidence, because, as discussed above, that evidence also was relevant to the 145,000 and 155,000 B/D claims; indeed, the Plaintiffs presented such evidence at trial.

Similarly, the Appendix does not include the "doom and gloom" evidence which the Plaintiffs contend is also relevant to the 175,000 B/D claim. *See infra* Appendix. In short, the Plaintiffs allege the Defendants, while secretly planning for these expansions, communicated to the Plaintiffs dire predictions about the economic future of the refinery. This court need not consider such evidence to determine whether the Plaintiffs presented a material issue of fact regarding the existence of a 175,000 B/D expansion plan, because this evidence really bears on the separate issue of whether the Defendants withheld information about the alleged expansion. As stated above, this court need not address that question.

KII's contracting with Litwin to perform preliminary design and cost studies rises to the level of KII's making plans for this expansion. According to Merriam-Webster's Collegiate Dictionary, "to make plans" is synonymous with "to plan," which is defined as "to devise or project the *realization or achievement* of." Merriam-Webster's Collegiate Dictionary (10th ed., 1993) (emphasis added). "To study," however, merely means "to *consider* attentively or in detail." *Id.* (emphasis added). Resort to dictionaries thus confirms that which common parlance indicates: "studying" is not "planning," and, in this case, the term "making plans" connotes a higher level of commitment to the expansion than mere evidence of initial cost and design studies indicate.

Moreover, the totality of the remainder of the evidence provides an even stronger sense that KII's approach to this potential 175,000 B/D expansion was rather tentative, at least at the time of the SPA. In November of 1983, five months after the SPA, KII announced plans for a more aggressive expansion to over 200,000 B/D, a plan predicated on an entirely different technical approach than the ones studied by Litwin to effectuate the 175,000 B/D expansion. This approximately 200,000 B/D expansion envisioned adding a third crude processing unit, as opposed to the options studied by Litwin of either replacing or upgrading existing unit No. 1. Despite the 200,000 B/D expansion announcement, one month later KII was still merely considering the lesser, intermediate step of

expanding to 175,000 B/D, as evidenced by an announcement at the December 1983 Board of Directors Meeting that KII was continuing to analyze the technical and economic feasibility of the 175,000 B/D expansion options studied by Litwin. It was only in February 1984, eight months after the SPA, that KII apparently committed in any way to an approximately 175,000 B/D expansion.[7]  In sum, the evidence before the district court at summary judgment, viewed in a light most favorable to the Plaintiffs, shows at most that KII was considering an expansion to 175,000 B/D when the parties signed the SPA, but it does not demonstrate that KII was actually making plans for this expansion, as the Plaintiffs alleged in the Pretrial Order.  Thus, this court affirms the district court's grant of summary judgment for the Defendants on the 175,000 B/D expansion claim.

Alternatively, the evidence in no way establishes KII had firm plans for a 175,000 B/D expansion at the time of the SPA and, although the district court erred in requiring evidence of such firm plans, the Plaintiffs invited this error and thus cannot appeal it.  This court has long recognized the equitable doctrine of invited error.  *See United States v. Johnson*, 183 F.3d 1175, 1179 n.2 (10th Cir. 1999); *Air Exec.*, 584 F.2d at 944.  "The Invited Error doctrine prevents a party

---

[7]  This February 1984 commitment, however, was actually to expand Pine Bend's crude capacity merely to 170,000 B/D, something less than the amount pleaded by the Plaintiffs.

from inducing action by a court and later seeking reversal on the ground that the requested action was error." *Johnson*, 183 F.3d at 1178-79 n.2.

Here, the Plaintiffs induced the district court at the summary judgment stage to view their claim as asserting KII had made "firm plans" for a 175,000 B/D expansion. Both the Plaintiffs' expert witness, in his report, and their Brief in Opposition to the Defendants' Motion for Summary Judgment stated KII had "firm plans" for this expansion in June of 1983. One important purpose of written briefs and expert opinion evidence is to focus the court's attention on the specific nature of the legal theories and factual allegations at issue in a case. By claiming these "firm plans," the Plaintiffs themselves induced the district court to focus on whether KII had made such firm plans. *Cf. Air Exec.*, 584 F.2d at 944 (holding defendants could not appeal an inferential admission they had made in the Pretrial Order, as the Pretrial Order "measures the dimensions of the lawsuit").

This court acknowledges that it is the Pretrial Order which measures the dimensions of a lawsuit, and not a summary judgment brief or an expert's testimony, and therefore the district court erred in requiring evidence of "firm plans" rather than "making plans." Nonetheless, the Plaintiffs induced the district court into making this error, and thus they cannot challenge this heightened evidentiary requirement on appeal. Because the evidence before the district court

on summary judgment, viewed in a light most favorable to the Plaintiffs, provides no indication whatsoever that KII had made firm plans to expand Pine Bend to 175,000 B/D at the time of the SPA, this court affirms the district court's grant of summary judgment.

### 2. The Motion to Amend the Pretrial Order to Add a 200,000 B/D Expansion Claim

At the close of their case, the Plaintiffs moved to amend the Pretrial Order to conform to the evidence, asserting the Defendants had impliedly consented to the trial of a new claim: that the Defendants failed to disclose KII's pre-SPA plan to expand Pine Bend's capacity to 200,000 B/D. The district court denied that motion for several reasons. First, it resolved that the evidence at trial presented no new issues at all, but instead was the same evidence the Defendants presented at summary judgment to show the Plaintiffs always knew about KII's ideas for expansion. The district court thus concluded the Defendants did not consent to the trial of a new claim. Second, the district court reasoned that because the subject evidence was also relevant to the claims already being tried, the Plaintiffs could not rely on that evidence to amend the Pretrial Order in conformity with the evidence. Third, the district court determined its reasoning for granting the Defendants summary judgment on the 175,000 B/D claim applied with equal force to any possible 200,000 B/D claim. Finally, the district court concluded that forcing the Defendants to defend this new claim would unfairly disadvantage

them. This court reviews the district court's denial of the motion to amend for an abuse of discretion. *See Trierweiler v. Croxton & Trench Holding Corp*, 90 F.3d 1523, 1543 (10th Cir. 1996).

During defense counsel's cross-examination of William H. Hanna, the President of KII at the time of trial, Hanna stated the following:

> We really wanted very badly to do this, to be able to reverse [the Williams] pipeline, because we could see – as you've heard earlier, starting in '76 there was more product, more product, more product. We weren't naive. We knew we were heading to 200,000 barrels a day so we were looking for every outlet.

Later in the trial, the following exchange occurred between defendant David Koch and Plaintiffs' counsel during their direct examination:

> Q: Did you know in the fall of 1982 that the Pine Bend Refinery was heading to 200,000 barrels a day?
> A: Yes, Bernie Paulson had been talking about expanding the refinery to that number for many years.
> Q: This was the – Paulson starting talking about this –
> A: Yeah, in the 1970[s].
> Q: – in the 1970[s]. '70s. He'd advocated 200,000. Right?
> A: Well, it was a long-term objective, yes.
> . . .
> Q: That you, David Koch, then did know in the fall of 1982 that the company was heading to 200,000 barrels a day?
> A: Yes, at some distant point in the future. I mean, we were trying to get there eventually.
> . . .
> A: The 200,000 barrels a day was in the future. Now, I don't think we had any idea of – during the early 80s at what point we were going to reach 200,000 barrels a day, but it was almost certain that sooner or later we were going to get there.

In addition, Plaintiffs' counsel questioned both Bernard Paulson and William Koch about this alleged 1982 plan for expansion to 200,000 B/D.

The Plaintiffs contend that by eliciting Hanna's testimony and failing to object to the other testimony, the Defendants impliedly consented to the trial of a new claim, i.e., that the Defendants failed to disclose to the Plaintiffs KII's 200,000 B/D expansion plan. Because of this implied consent, the Plaintiffs argue, the district court erred by denying them leave to amend the pretrial order to include this additional claim.

Federal Rule of Civil Procedure 15(b) provides:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment . . . .

Fed. R. Civ. P. 15(b). A party impliedly consents to the trial of an issue not contained within the pleadings either by introducing evidence on the new issue or by failing to object when the opposing party introduces such evidence. *See* *Hardin v. Manitowoc-Forsythe Corp.*, 691 F.2d 449, 457 (10th Cir. 1982).

Contrary to the Plaintiffs' characterization of Hanna's and David Koch's testimony, the Defendants neither introduced evidence on a new issue nor failed to object to that type of evidence. Indeed, this testimony presented anything but a new issue. Both before and during the course of this litigation, the Plaintiffs were

-24-

fully aware that beginning in 1977, KII President Bernard Paulson had lobbied to expand Pine Bend to a capacity of 200,000 B/D. The Defendants presented evidence at summary judgment demonstrating the Plaintiffs possessed knowledge of Paulson's aspiration to expand Pine Bend's capacity to 200,00 B/D. *See* 6A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1527, at 287-89 (1990) ("[I]f the evidence or issue was within the knowledge of the party seeking modification [of the pretrial order] at the time of the [pretrial conference] . . . then it may not be allowed.") Moreover, in both the 1993 and 1998 Pretrial Orders, the Defendants attempted to refute the Plaintiffs' non-disclosure claim by contending that the Plaintiffs were aware of KII's engagement in a process for expansion. Thus, this longstanding objective to expand Pine Bend to a 200,000 B/D capacity was both known by the Plaintiffs and raised in the pleadings.

The Plaintiffs now argue that prior to the early 1980's, KII had abandoned Paulson's idea for expansion, and therefore, the trial testimony pointed to some new 200,000 B/D expansion plan first proposed in 1982 and about which the Defendants were not informed. The only fair, contextual reading of the testimony, however, does not support the Plaintiffs' interpretation. Both Hanna and David Koch unequivocally stated that this 1982 200,000 B/D expansion objective had originated with Paulson back in 1976. Therefore, the district court

did not abuse its discretion in concluding that the Defendants had not consented to the trial of an issue not raised in the pleadings.

In addition, Hanna's and David Koch's testimony about the 200,000 B/D expansion plan was relevant to issues already being tried. "When the evidence claimed to show that an issue was tried by consent is relevant to an issue already in the case, and there is no indication that the party presenting the evidence intended thereby to raise a new issue, amendment may be denied in the discretion of the trial court." *Hardin*, 691 F.2d at 457; *see also Dole v. Mr. W Fireworks, Inc.*, 889 F.2d 543, 547 (5th Cir. 1989) ("The evidence that [plaintiff] alleges to have shown *implied* consent was also relevant to the other issues at trial and cannot be used to imply consent to try the present issue." (emphasis in original)). The Plaintiffs' awareness of all KII's ideas for expanding Pine Bend was relevant to whether the Plaintiffs were unaware of the purported 145,000 and 155,000 B/D expansions, claims that were being tried. Undoubtedly, that is why defense counsel elicited this testimony, not because the Defendants intended to raise a new issue. The Defendants were merely attempting to demonstrate that KII embraced a healthy corporate philosophy to act aggressively, move ahead, and increase market share, a philosophy of which the Plaintiffs were aware. The evidence regarding the 200,000 B/D expansion goal was introduced simply to illustrate the Plaintiffs' knowledge of that philosophy and thus of the two lesser

expansions, not to inject evidence of a specific or discrete plan, as argued by the Plaintiffs. The district court, therefore, did not abuse its discretion in denying the Plaintiffs' motion to amend the Pretrial Order.

Alternatively, the Plaintiffs argue that even if the Defendants did not consent to trial of a 200,000 B/D expansion claim, the district court still should have granted the Plaintiffs' motion to amend the Pretrial Order because the Defendants failed to show that they would be prejudiced by the trial of the new claim.[8] This argument, however, relies on an incorrect interpretation of the district court's reasoning. The district court did not conclude merely that the Defendants failed to consent, but also that the evidence at issue presented no new claim. Although Rule 15(b) does allow a court, under certain circumstances, to

---

[8] Federal Rule of Civil Procedure 15(b) provides,

> If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits.

Fed. R. Civ. P. 15(b); *see also Hardin v. Manitowoc-Forsythe Corp.*, 691 F.2d 449, 457 (10th Cir. 1982) ("Even where there is no consent, and objection is made at trial that evidence is outside the scope of the pretrial order, amendment may still be allowed unless the objecting party satisfies the court that he would be prejudiced by the amendment.").

amend pleadings to conform to evidence even when the opposing party objected to that evidence, application of any portion of Rule 15(b) is appropriate only when an issue "not raised by the pleadings" has, in fact, been presented. Fed. R. Civ. P. 15(b). As discussed above, the district court did not abuse its discretion in concluding the testimony about the longstanding aspiration to expand Pine Bend to 200,000 B/D presented no issues not raised in the pleadings, both because the Plaintiffs were previously aware of this evidence and because this evidence was relevant to other issues already being tried. Rule 15(b), therefore, does not apply at all to this testimony, and this court need not undertake a Rule 15(b) prejudice analysis with respect to that testimony. Thus, we affirm the district court's denial of the Plaintiffs' motion to amend the pleadings to conform to the evidence.

B. Accounting Claims

During discovery, the Plaintiffs obtained, for the first time, a document entitled "Extraordinary Items 1982," a list of company expenses and other accounting items from 1982 prepared by KII's controller, Milton Hall. After discovering the existence of Hall's list, the Plaintiffs were granted leave of court to amend their complaint, adding allegations about KII's accounting treatment of the items on Hall's list. They contended the Defendants' 1982 financial

statements, upon which the Plaintiffs relied when valuing KII stock for the SPA, failed to identify the items on Hall's list as non-recurring. Because these expenses were, according the Plaintiffs, actually non-recurring in nature, the Plaintiffs undervalued the company by approximately $283 million.

The Plaintiffs sought recovery for these alleged mischaracterizations as a violation of both the Full Disclosure and the Generally Accepted Accounting Principles ("GAAP") warranties contained in the SPA, as well as the Defendants' fiduciary duty of full disclosure. With respect to these accounting claims, the Plaintiffs raise three issues on appeal: (1) whether the district court improperly required the Plaintiffs to prove, as a predicate for all of their accounting claims, that these expenses were "unusual" or "infrequently occurring" as defined by GAAP; (2) whether the district court abused its discretion by failing to amend the 1998 Pretrial Order [9] to make clear that the accounting claims did not hinge on the jury's finding the items were "unusual" or "infrequently occurring" as defined by GAAP; and (3) whether the district court erroneously denied the Plaintiffs an opportunity to present certain rebuttal testimony to the defense theory on these claims.

---

[9] Unlike the 1993 Pretrial Order, this order was file-stamped, signed by the district court, and subject to a Pretrial Conference. *See supra* note 3. Indeed, this was the final Pretrial Order prior to trial, which incorporated the summary judgment rulings and ultimately controlled the course of the trial.

*1. Requiring Proof of "Unusual" or "Infrequently Occurring" Losses Under GAAP*

In the 1998 Pretrial Order, the Plaintiffs set forth the following claims:

KII employed accounting methods that were designed intentionally to understate KII's earnings and assets in the financial statements. . . .

To diminish its apparent earnings, KII therefore employed the following accounting practice which *violated GAAP and constituted breaches of both warranties in the Stock Purchase and Sale Agreement* (quoted above): KII failed to disclose its *unusual and/or infrequently occurring* losses. KII categorized these losses as recurring expenses or depreciation, thereby artificially reducing what appeared to be KII's ordinarily recurring income.

(emphasis added)

Later that year, in ruling on a defense motion *in limine* seeking to exclude some of the Plaintiffs' expert testimony on the accounting claims, the district court responded to the parties' arguments about the parameters of these claims: "If the plaintiffs intend to pursue an allegation that the defendants failed to disclose information on items that are neither unusual or infrequently occurring under GAAP, then the court rules that such an allegation or theory is outside the plaintiffs' accounting claim as pleaded in the pretrial order . . . ." The district court looked to the 1998 Pretrial Order, which articulated only one factual basis for the Plaintiffs' accounting claim regarding these expenses: "KII failed to disclose its unusual and/or infrequently occurring losses." Additionally, the district court noted the Plaintiffs "chose to define these losses with accounting

-30-

parlance borrowed from GAAP."  Thus, the district court concluded the Plaintiffs must prove the Defendants failed to disclose "unusual" or "infrequently occurring" items, as defined by GAAP, to prevail on their accounting claims and therefore excluded any expert testimony on disclosure requirements for losses that were not "unusual and/or infrequently occurring."

At trial, Alfred Eckert, a former Goldman Sachs investment banker who led the team hired by William Koch to value KII for purposes of the SPA, explained that when valuing a company's stock, he would add back into the company's earnings certain non-recurring losses.  He further testified that his decision to add back these items depended not on generally-accepted accounting principles, but simply on whether, in his opinion, the losses likely would recur.  On the Defendants' motion and over the Plaintiffs' objection, the district court then instructed the jury that the "plaintiffs' accounting claim is limited to the defendants' failure to disclose items that are unusual and/or infrequently occurring as those terms are defined by [GAAP]" and to disregard Eckert's testimony addressing the treatment of non-recurring items that do not fall within these definitions.  The district court also issued an order (the "May 12, 1998 Order") consistent with these instructions resolving that the accounting claims were predicated on the Plaintiffs' ability to prove the losses at issue were unusual or infrequently occurring under GAAP.  Finally, both the instructions which the

court gave the jury at the close of the trial and the jury's verdict form all indicated that to prevail on their accounting claim, under any legal theory, the Plaintiffs were required to prove the Defendants failed to disclose infrequently occurring losses as defined by GAAP.

On appeal, the Plaintiffs challenge the district court's orders and actions hinging their accounting claims on proof that the items at issue were unusual or infrequently occurring as defined by GAAP. This court reviews for abuse of discretion a district court's exclusion of evidence or issues from trial on the basis of a properly-drawn, detailed pretrial order. *See Grant v. Brandt*, 796 F.2d 351, 355 (10th Cir. 1986).

It is first important to note that the failure to disclose "unusual and/or infrequently occurring losses" constitutes the sole factual basis pleaded by the Plaintiffs in the 1998 Pretrial Order to support their claims regarding the Defendants' accounting treatment of KII expenses. Because a pretrial order defines the scope of an action for trial, the Plaintiffs were thus obligated to prove this one specific factual contention to prevail on their accounting claims. *See* Fed. R. Civ. P. 16(e) (A pretrial order entered after a pretrial conference "shall control the subsequent course of the action unless modified by a subsequent order."); *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 817 (10th Cir. 1979) ("When issues are defined by the pretrial order, they ought to be adhered to in the absence

of some good and sufficient reason.") (citation and internal quotation marks omitted). The question then is whether the district court properly determined the Plaintiffs needed to prove the losses were unusual or infrequently occurring as defined by GAAP, or whether infrequent occurrence under some other standard would have sufficed.

As the Plaintiffs point out, this court has recognized that a pretrial order "should be 'liberally construed to cover any of the legal or factual theories that might be embraced by [its] language.'" *Trujillo*, 608 F.2d at 818 (quoting *Rodriguez v. Ripley Indus., Inc.*, 507 F.2d 782, 787 (1st Cir. 1974)). A careful reading of this court's cases reviewing trial courts' construction of pretrial orders, however, reveals that a district court may more strictly construe a pretrial order when that order has been refined over time, properly drawn, and drafted with substantial specificity. *See, e.g., Cleverock Energy Corp. v. Trepel*, 609 F.2d 1358, 1361-62 (10th Cir. 1979) (affirming trial court's exclusion of breach of fiduciary duty issue as beyond the scope of the pretrial order when the objecting party "failed to take timely advantage of an opportunity to enlarge upon the general terms used in the order"); *Rigby v. Beech Aircraft Co.*, 548 F.2d 288, 291-92 (10th Cir. 1976) (affirming trial court's exclusion of evidence of defects in 40-gallon fuel cells of airplane when the plaintiffs' answers to interrogatories and the pretrial order consistently alleged defects only in the plane's 31-gallon fuel cells).

On the other hand, this court has more liberally construed pretrial orders when the orders are not drafted with substantial care and specificity. *See, e.g., Whalley v. Sakura*, 804 F.2d 580, 582-83 (10th Cir. 1986) (liberally construing pretrial order when "pretrial order . . . stated the claims of the plaintiff in general terms"); *Trujillo*, 608 F.2d at 817-19 (broadly construing a pretrial order that was "not properly drawn, [was] not definitive, specific, complete or detailed").

In *Cleverock Energy* this court elaborated on the reasons for allowing two divergent approaches to construing pretrial orders:

> This court is acutely aware of the evils of the inflexible application of a pretrial order. These evils are aggravated when the pretrial order is unrefined. We recently held [in *Trujillo*] that a coarse pretrial order could not be narrowly applied to exclude one of three subtheories fairly encompassed within its general terms. However, we should not lose sight of the important policies behind the pretrial order mechanism, i.e., the narrowing of issues to facilitate an efficient trial and to avoid surprise.

*Cleverock Energy*, 609 F.2d at 1361-62 (citations omitted). Ultimately, the court held, "We cannot in these circumstances conclude that the trial judge, who presided over the pretrial conferences of this extensive litigation and had before him the pleadings, motions and various pretrial statements of the parties, abused his discretion in striking the . . . issue as beyond the scope of the litigation." *Id.* at 1362. In sum, while pretrial orders generally should be construed liberally, a district court may more strictly construe such an order when the party favoring a

liberal construction has had ample opportunity to refine the order and when the final order is properly drawn and substantially specific.

The Plaintiffs do not allege that the 1998 Pretrial Order was improperly drawn. Indeed, a pretrial conference was held on August 25, 1997, after which a proposed order was drafted. *See* Fed. R. Civ. P. 16(d). The district court signed the 1998 Pretrial Order on February 6, 1998. *See* Fed. R. Civ. P. 16(e). Further, this court has noted a proper pretrial order is "definitive," "sharpen[s] and simplifie[s] the issues to be tried," and "represents a complete statement of all the contentions of the parties." *Trujillo*, 608 F.2d at 817 (citations and internal quotations omitted). The 1998 Pretrial Order in this case fits that bill, as many years of draft pretrial orders, district court orders, and discovery served to focus the legal and factual contentions of the parties and culminated in this final pretrial order. Additionally, because numerous draft pretrial orders were produced over the many years of this litigation, the Plaintiffs cannot claim that they lacked opportunities to draft the order to clearly encompass their claims. Because the 1998 Pretrial Order was properly drawn, with relative specificity and definitiveness, and because the Plaintiffs had ample opportunity to refine the order, the district court was not required to afford the Plaintiffs overly-generous leeway in its construction of their accounting claims.

Indeed, a contextual reading of the 1998 Pretrial Order leads this court to conclude that the district court did not abuse its discretion in determining that the Plaintiffs' accounting claims predicated recovery on their ability to prove the losses at issue were unusual or infrequently occurring as defined by GAAP. Again, the 1998 Pretrial Order frames this accounting claim in the following terms: "To diminish its apparent earnings, KII therefore employed the following accounting practice which *violated GAAP and constituted breaches of both warranties in the Stock Purchase and Sale Agreement* (quoted above): KII failed to disclose its *unusual and/or infrequently occurring* losses." (emphasis added). As the district court noted in its May 12, 1998 order, the words "unusual and/or infrequently occurring" are terms of art used in GAAP literature, which the Plaintiffs earlier referenced at the summary judgment stage. Furthermore, this lone factual allegation mentioning unusual and infrequently occurring losses immediately follows a portion of the sentence which asserts a GAAP violation.

To support their reading of the 1998 Pretrial Order, the Plaintiffs point to the conjunction "and" between the asserted GAAP violation and the alleged breaches of two warranties, as well as the reference to "both warranties." This language, however, bolsters, rather than subverts, the district court's construction of the pretrial order. The first of the two referenced warranties (the "GAAP Warranty") warranted that the financial statements disclosed to the Plaintiffs as of

December 31, 1981 and December 31, 1982 "fairly present the . . . financial condition . . . of . . . [KII] . . . in accordance with generally accepted accounting principles . . . ." The second warranty (the "Full Disclosure Warranty") stated that since December 31, 1982, the Defendants had provided all information "which if fully disclosed might materially affect the valuation of the stock of [KII] . . . ." Although only the first of these warranties explicitly required GAAP compliance, by pleading that the Defendants' accounting practices violated GAAP "and" "both warranties," the Plaintiffs appear to assert that because these practices violated GAAP they necessarily violated the Full Disclosure Warranty as well as the GAAP Warranty. Otherwise, the initial reference to the GAAP violation which precedes the word "and" would be superfluous, given the factual allegation using GAAP terminology which follows. Thus, the claim ties GAAP requirements to both warranties, as well as to the words "unusual" and "infrequently occurring."

Similarly, this court rejects the Plaintiffs' argument that because they separately pleaded breach of fiduciary duty, along with breach of these two warranties, the court should not read the words "unusual" and "infrequently occurring" as GAAP terms of art when applied to their breach of fiduciary duty claim. In its May 12, 1998 order, the district court responded to this argument: "There is no reasonable construction of this pretrial order that is so liberal as to

permit a court to read terms of art in the same sentence as having two different meanings simply because the party subsequently asserts an alternative legal theory." This court concurs with that assessment. Further, as the district court noted in that May 12 order, the Plaintiffs failed to exercise their drafting prerogative to include a different, alternative, or additional definition in the Pretrial Order. Instead, they effectively expressed their satisfaction to be bound by the GAAP definition.

Finally, in analyzing the 1998 Pretrial Order, the district court properly considered the parties' motions, briefs, and arguments regarding the accounting claims that came before it throughout the thirteen years in which that court presided over this litigation. The district court stated, "[T]he plaintiffs did not allude during the summary judgment proceedings to any position that their two legal theories on the accounting claim were based on alternative meanings to 'unusual and/or infrequently occurring losses.'" The record bears out the accuracy of this statement. For example, in its Memorandum in Opposition to the Defendant's Motion for Summary Judgment, the Plaintiffs assert, "Thus, Koch . . . failed – *contrary to GAAP* – to disclose its 1982 writeoffs as unusual, non-recurring expenses." (emphasis added).

In conclusion, this court holds that the district court, with its thirteen years of reading and listening to the parties' assertions and arguments concerning these

accounting claims, did not abuse its discretion when it construed a properly drawn, refined, and specific pretrial order as excluding any accounting claims not predicated on proof that the losses at issue were unusual or infrequently occurring by GAAP definitions.

### 2. The District Court's Failure to Amend the Pretrial Order

The Plaintiffs further argue the district court erred by failing to amend the pretrial order to permit the trial of accounting claims not predicated on proof of unusual or infrequently occurring losses as defined by GAAP. Although the Plaintiffs never formally moved for an amendment of the pretrial order, this court "interpret[s] the assertion of an issue not listed in the pretrial order as the equivalent of a formal motion to amend the order . . . ." *Trierweiler*, 90 F.3d at 1543. Thus, by opposing the Defendants' *in limine* motion, eliciting Eckert's testimony, and opposing the Defendant's motion to strike that testimony as beyond the scope of the pretrial order, the Plaintiffs effectively moved for an amendment of the pretrial order.

This court reviews a district court's failure to amend a final pretrial order for an abuse of discretion. *See id.* Federal Rule of Civil Procedure 16(e) provides, "The order following a final pretrial conference shall be modified only to prevent manifest injustice." Fed. R. Civ. P. 16(e). Furthermore, the burden of demonstrating manifest injustice falls upon the party moving for modification.

-39-

*See R.L. Clark Drilling Contractors, Inc. v. Schramm, Inc.*, 835 F.2d 1306, 1308 (10th Cir. 1987). This court considers the following factors when faced with a challenge to a district court's exclusion of an issue by failing to amend a pretrial order: (1) prejudice or surprise to the party opposing trial of the issue; (2) the ability of that party to cure any prejudice; (3) disruption to the orderly and efficient trial of the case by inclusion of the new issue; and (4) bad faith by the party seeking to modify the order.[10] *Cf. Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1108 (10th Cir. 1998); *Smith v. Ford Motor Co.*, 626 F.2d 784, 797 (10th Cir. 1980). This court should also consider whether the party favoring amendment of the pretrial order formally and timely moved for such modification in the trial court. When a party fails to formally move for modification, it neglects to focus the trial court's attention on the factors informing on the

---

[10] The Plaintiffs contend the district court was required to consider these factors and its failure to do so itself constitutes an abuse of discretion. This court has never imposed such a requirement upon a district court when deciding whether to amend a pretrial order or allow evidence or issues outside the pretrial order to be presented; rather, we have always discussed these factors as matters which *this court* should consider to determine if the district court's decision constitutes an abuse of discretion. *See Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1108 (10th Cir. 1998); *Smith v. Ford Motor Co.*, 626 F.2d 784, 797 (10th Cir. 1980). Thus, the district court's failure to make explicit findings under these four factors does not render its decision an abuse of discretion. The argument raised here by the Plaintiffs is particularly disingenuous, given their own failure to formally move to amend the order. The Plaintiffs simply cannot claim an abuse of discretion by the district court for not reciting the factors for consideration of a motion to amend a pretrial order when they failed to formally make such a motion.

amendment determination and generally prevents the creation of an adequate record as to the other four factors, thus limiting our effectiveness in reviewing the trial court's decision. *Cf. Hullman v. Board of Trustees of Pratt Community College*, 950 F.2d 665, 667-68 (10th Cir. 1991). The failure to formally move to amend the pretrial order in this case resulted in exactly those consequences. This court must therefore independently surmise the import of amending the pretrial order to allow the trial of accounting claims not theretofore made.

Allowing the Plaintiffs to pursue any accounting claims without having to prove the expenses at issue were unusual or infrequently occurring as defined by GAAP would have significantly prejudiced and surprised the Defendants. When the district court issued its March 1998 *in limine* order, it fully apprised all parties of its understanding of the pretrial order and the parameters of the accounting claims for trial. The Defendants undoubtedly relied upon that ruling to prepare their own presentation of evidence as well as anticipate the Plaintiffs' case. As a consequence, the Plaintiffs' sudden attempt to inject into the trial evidence which the *in limine* order had precluded necessarily surprised the Defendants. Additionally, a proper defense of these essentially new accounting claims would have justified a mid-trial reopening of discovery, the addition of new witnesses,

and further motions and briefings.[11]  After spending thirteen years honing their defenses, this sudden amendment of the pretrial order would have significantly prejudiced the Defendants.  *Cf. Joseph Mfg. Co., Inc. v. Olympic Fire Corp.*, 986 F.2d 416, 420 (10th Cir. 1993) (stating that defendant's failure to raise specific defense at an earlier possible juncture "cuts deeply against his claim of manifest injustice").  Although the court could have allowed the Defendants to undertake this additional work in order to cure the prejudice of injecting new issues into the trial, to do so might have so severely disrupted the orderly and efficient course of an ongoing trial that we cannot say the district court's refusal was an abuse of discretion.  Finally, the Plaintiffs' neglect in not formally moving for amendment of the pretrial order weighs against overturning the district court's decision.  An analysis of the applicable factors leads this court to conclude the Plaintiffs have not demonstrated that manifest injustice resulted from the district court's failure to amend the pretrial order and correspondingly they have failed to demonstrate the district court abused its discretion in not amending the pretrial order.

---

[11]  Even if this court construes the Plaintiffs' opposition to the *in limine* order as the equivalent of a motion to amend the pretrial order and thus views the surprise and prejudice from that point in time rather than from the elicitation of evidence during trial, the Defendants still would have suffered the prejudice of having just four months to prepare defenses to legal theories which the pleadings up until that point had failed to articulate.  Furthermore, and as discussed below, analysis of the other factors firmly supports our conclusion that the district court acted within its discretion in not amending the pretrial order.

### 3. The Rebuttal Testimony

During the Defendants' case, three defense witnesses testified that KII was by nature a risk-taking company and the losses at issue resulted from risky ventures. With this testimony, the Defendants sought to demonstrate that these losses did not constitute unusual or infrequently occurring losses under GAAP definitions. Because those definitions account for the "the environment in which the entity operates," the Defendants presented testimony that KII operated within a business environment in which it routinely took risks and suffered resulting losses. In addition, according to the Plaintiffs, one of these defense witnesses, Lynn Markel, on cross-examination disputed the testimony of Milton Hall, KII's controller, about some of the facts underlying the items on Hall's list of "Extraordinary Items," which had triggered the Plaintiffs' accounting claims.

The Plaintiffs then sought to recall one of their accounting witnesses, Gary Gibbs, on rebuttal. The Plaintiffs proffered that this witness would testify the Defendants' interpretation of the GAAP definitions was incorrect and Markel's testimony disputing Hall was contradicted by the underlying documents and financial statements. The district court precluded this rebuttal testimony, concluding the Plaintiffs reasonably could have anticipated this defense theory and evidence in their case-in-chief.

The Plaintiffs now challenge that decision, arguing that prior to the testimony of these defense witnesses, the Defendants' theory "had always focused on the likely recurrence of a type of *event* or *write-down*." With the introduction of this testimony, the Plaintiffs assert, the Defendants' theory "suddenly twisted into whether [KII] was a type of *company* that had to report its non-recurring losses the same way as other companies." Thus, the Plaintiffs contend they were entitled to present rebuttal testimony to this new defense theory and the district court erred by denying them the opportunity to do so.

This court reviews for an abuse of discretion a district court's refusal to allow rebuttal testimony. *See Marsee v. United States Tobacco Co.*, 866 F.2d 319, 324 (10th Cir. 1989). "[W]here the evidence rebuts new evidence or theories proffered in the defendant's case-in-chief, that the evidence may have been offered in the plaintiff's case-in-chief does not preclude its admission in rebuttal." *Bell v. AT&T*, 946 F.2d 1507, 1512 (10th Cir. 1991). When plaintiffs, however, seek to rebut defense theories which they knew about or reasonably could have anticipated, the district court is within its discretion in disallowing rebuttal testimony. *See Comcoa, Inc. v. NEC Telephones, Inc.*, 931 F.2d 655, 664 (10th Cir. 1991) ("Because plaintiffs were warned that rebuttal evidence would be restricted and because they reasonably could have anticipated defendants' evidence . . . [i]t was within the district court's discretion to disallow plaintiffs'

rebuttal evidence."); *Fashauer v. New Jersey Transit Rail Operations Inc.*, 57 F.3d 1269, 1287 (3d Cir. 1995) (holding that district court acted within its discretion by precluding rebuttal testimony to that which reasonably could have been anticipated). This court in fact endows the district court with "broad discretion" in deciding whether to admit or exclude rebuttal evidence. *United States v. Olivo*, 80 F.3d 1466, 1470 (10th Cir. 1996); *see also Geders v. United States*, 425 U.S. 80, 86 (1976) (discussing trial court's broad powers to manage a trial, including rebuttal testimony).

The GAAP definitions for "unusual" and "infrequently occurring" should have alerted the Plaintiffs to the likelihood that the Defendants would argue the nature of KII's business endeavors rendered the expenses at issue usual and frequently occurring. The Accounting Principles Board Opinion No. 30, an opinion at the heart of these accounting claims, refers to the following GAAP definitions for "unusual nature" and "infrequency of occurrence":

> **Unusual nature** – the underlying event or transaction should possess a high degree of abnormality and be of a type clearly unrelated to, or only incidentally related to, the ordinary and typical activities of the entity, *taking into account the environment in which the entity operates*.
> **Infrequency of occurrence** – the underlying event or transaction should be of a type that would not reasonably be expected to recur in the foreseeable future, *taking into account the environment in which the entity operates*.

*Reporting the Results of Operation–Reporting the Effects of Disposal of a Segment of a Business, and Extraordinary, Unusual, and Infrequently Occurring Events and Transactions*, APB Opinion No. 30 (June 1973) (emphasis added). These definitions explicitly underscore the need to consider accounting items within "the environment in which the entity operates" when determining whether to classify such items as unusual or infrequently occurring by GAAP standards. Indeed, in opposing the Defendants' motion for summary judgment, the Plaintiffs themselves referenced the language found in APB Opinion No. 30 and pointed out the significance of this language. The Plaintiffs should not have been surprised, therefore, when the defense witnesses discussed the risk-taking business environment in which KII operates and the effect of this environment upon the accounting treatment of expenses.

Furthermore, testimony which the Defendants elicited on cross-examination early in the Plaintiffs' case-in-chief also should have put the Plaintiffs on notice of the Defendants' "risk-taking environment" theory. In cross-examining Milton Hall about his list of "Extraordinary Items," defense counsel took Hall through his list item-by-item, having Hall explain the particular business context in which each of the losses was sustained. Hall thus provided a broad overview of KII's various business enterprises, describing how each of these enterprises both sought to make money and yet routinely suffered losses. One particularly relevant

example of this testimony occurred when Hall described KII's practice of trading in futures markets, which resulted both in occasional profits and losses; Hall analogized KII's involvement in the futures market to an individual who trades in the stock market. The effect of this testimony should not have been lost on the Plaintiffs. Even at this early stage of the Plaintiffs' case-in-chief, the Defendants sought to establish the significance of KII's specific and unique business practices to their accounting treatment of particular expenses. Having listened to Hall's testimony, the Plaintiffs reasonably should have anticipated the Defendants' further elaboration on this theory during their own case. Indeed, the Plaintiffs could easily have countered this testimony prior to closing their case-in-chief.[12]

Finally, it is significant that the Plaintiffs never objected to the testimony elicited by the defense as outside the scope of the defenses articulated in the pretrial order. Had the Plaintiffs raised such an objection, the district court might have limited the controversial testimony and thus obviated the Plaintiffs' asserted need to call a rebuttal witness. Because the Plaintiffs should reasonably have anticipated the evidence they sought to rebut and then failed to object to the

---

[12] Only the seventh of twenty-four witnesses called by the Plaintiffs, Hall testified on April 16, 1998. The trial had begun a mere ten days earlier, and the Plaintiffs did not close their case until one month later on May 18, 1998.

evidence as supportive of a new theory beyond the Pretrial Order, the district court did not abuse its broad discretion in precluding the rebuttal witness.

Regarding the Plaintiffs' contention that this rebuttal witness was necessary to counter defense witness Lynn Markel, who allegedly contradicted the factual testimony of Milton Hall, the record both undermines the Plaintiffs' characterization of Markel's testimony and reveals that plaintiffs' counsel himself elicited the disputed testimony on cross-examination. Markel initially disagreed with facts and conclusions testified to by a different plaintiffs' witness, Gary Gibbs, even stating, "I don't know where Mr. Gibbs got his information." The Plaintiffs' attorney then asked, "Did you know that, in fact, Mr. Gibbs had gotten that information from Milton Hall?" Markel replied, "No." The Plaintiffs' attorney then made a final attempt to draw out Markel's disagreement with Hall, eliciting testimony which the Plaintiffs now claim demanded a rebuttal witness: "Q: You told the jury last week that Mr. Gibbs had his facts wrong. And in truth, you disagree with Milton Hall, don't you? A: Mr. Gibbs had his facts wrong, sir." Contrary to the Plaintiffs' assertion in support of their argument for a rebuttal witness, Markel did not dispute Hall's testimony, but rather disagreed with the testimony of Gibbs. Further, even if Markel had disputed Hall's testimony, the Plaintiffs' attorney intentionally elicited such testimony. The record makes clear that Markel was not an out-of-control or unresponsive witness, or one

aggressively attempting to advocate on cross-examination. When an attorney conducting cross-examination affirmatively draws out specific testimony, as occurred here, the district court does not abuse its discretion by disallowing rebuttal to that testimony.

## C. Evidentiary Rulings

### 1. Admission of Evidence of Other Lawsuits

Prior to trial, the Plaintiffs moved *in limine* to exclude any evidence of other lawsuits which they filed against the Defendants after filing the instant action in 1985. The court ruled, however, that evidence of these other lawsuits, including that plaintiff William Koch named his own mother as a defendant in one, demonstrated William's ongoing hostility toward his brothers Charles and David. The court further ruled that the evidence of these lawsuits was relevant to William's purported reliance on Charles and David prior to the SPA, as well as to his bias and credibility as a fact witness. The Plaintiffs then moved for reconsideration and modification of this *in limine* ruling. In response, the district court issued another order clarifying that evidence of other lawsuits could not be offered to show William "likes to file lawsuits, that [he] files lawsuits devoid of merit, or that [he] lacked proper feelings and consideration for his mother." In addition, the district court stated that William should have an opportunity to

explain his reasons for filing these lawsuits, but that there was no need for either side to introduce evidence, comments, findings, or rulings from these other suits.

During opening statement and over the Plaintiffs' objection, defense counsel noted that William's hostility toward his brothers was the motive behind the instant suit, as evidenced by his and Frederick Koch's later suit against the Koch Family Charitable Foundation and its trustees, which included "their own mother." Furthermore, while cross-examining William, defense counsel elicited testimony that William had sued his brothers and mother in the Foundation litigation, that he greatly upset his mother by subpoenaing her into court, and that he later brought suit challenging his mother's will. The Plaintiffs objected to this line of questioning as irrelevant and a violation of the court's *in limine* order. As a consequence, the court instructed the Defendants not to delve into the specific facts of these lawsuits. Two days later, the Plaintiffs filed a motion for a mistrial because the Defendants had unfairly elicited testimony about William's suing his mother and injected evidence of the outcome of one post-1985 lawsuit. The district court denied that motion. Two weeks later, however, the district court precluded the introduction of any further evidence that William sued his mother. Finally, before submitting the case to the jury, the district court gave an instruction only to consider evidence of these other lawsuits "on issues of the motives, intent, bias, and credibility of the parties," and not to consider whether

any party is overly litigious or to cast judgment on the propriety of the intra-family relationships.

The Plaintiffs now challenge the district court's rulings which allowed introduction of this evidence of post-1985 lawsuits. They argue this evidence lacked relevance or, at best, had *de minimis* probative value which was substantially outweighed by the danger of prejudice resulting from William's admission that he sued his own mother. "[T]he admission or exclusion of evidence lies within the sound discretion of the district court and will not be reversed absent an abuse of discretion." *Seymore v. Shawver & Sons Inc.*, 111 F.3d 794, 800 (10th Cir. 1997). To determine whether a district court properly admitted evidence of other acts, this court requires:

> (1) the evidence was offered for a proper purpose; (2) the evidence was relevant; (3) the trial court determined under Fed. R. Evid. 403 that the probative value of the evidence was not substantially outweighed by its potential for unfair prejudice; and (4) the trial court gave the jury the proper limiting instructions upon request.

*United States v. Lazcano-Villalobos*, 175 F.3d 838, 846 (10th Cir. 1999) (quotation omitted).

The Defendants offered the disputed evidence for proper purposes. The Defendants first claimed that evidence of these lawsuits demonstrated William Koch's bias. *See United States v. Abel*, 469 U.S. 45, 51 (1984) (holding that the use of evidence of bias to impeach a witness is permissible); *United States v.*

*DeSoto*, 950 F.2d 626, 630 (10th Cir. 1991). Additionally, the Defendants asserted that this evidence bore directly on an essential element of several of William's claims: whether William relied on the Defendants' misrepresentations.[13] *See United States v. Shumway*, 112 F.3d 1413, 1421-22 (10th Cir. 1997) ("Prior acts evidence is clearly relevant to show an essential element . . . ." (quotation omitted)). The evidence therefore was offered for permissible purposes.

Evidence of the post-1985 lawsuits, however, did not in fact bear upon these two stated purposes. Thus, the district court should have excluded the evidence as irrelevant. Federal Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of

---

[13] The district court gave the following instruction to the jury:

> I have instructed you, with respect to the plaintiff(s)' claims based on theories of state law fraud, breach of fiduciary duty and Section 10(b), that the plaintiff(s) cannot prevail without proof of actual reliance, that is, they would not have sold their shares at the price actually paid without the defendant(s)' misrepresentations or omissions. . . . [I]f you find that the plaintiff(s) did not actually rely on any belief that the defendant(s) had completely and truthfully disclosed the material facts but instead actively doubted the defendant(s) and relied on the expectation that they could later sue the defendant(s) for breach of warranty, then your verdict should be for the defendant(s) on the plaintiff(s)' claims asserting theories of state law fraud, breach of fiduciary duty and Section 10(b).

The Plaintiffs never objected to this instruction. As a consequence, reliance was treated as an essential element of these three legal claims.

consequence to the determination of the action more or less probable than it would be without the evidence." Fed. R. Evid. 401. Federal Rule of Evidence 402 bars the introduction of any evidence that is not relevant. *See* Fed. R. Evid. 402. This court first fails to understand how evidence that William filed these lawsuits actually demonstrates to any degree that William's testimony may be less credible due to his bias against his brothers, particularly when the Defendants did not, and perhaps could not, show that these lawsuits were frivolous. The Second Circuit rejected the precise argument advanced by the Defendants, concluding that evidence of other suits brought by a plaintiff against the defendants "go[es] to character rather than bias." *Outley v. City of New York*, 837 F.2d 587, 594 (2d Cir. 1988). Although the *Outley* court recognized the possibility that evidence of other lawsuits could be probative as to bias, "the particular details of each action, and the extent to which the bringing of each action was justified, must be before the jury" to render the evidence relevant and admissible. *Id.* at 595. Here, the district court precluded such an examination of the details and merit of the lawsuits, and thus, the evidence admitted was not relevant to William's alleged bias.

Additionally, the evidence admitted was not relevant to the issue of William's reliance on his brothers' representations in signing the SPA. The evidence concerned lawsuits filed at least two years after the SPA and in part

indicated William had sued his mother.  Though the filing of these lawsuits might demonstrate William's distrust of his brothers *after* 1985, the parties entered into the SPA in 1983.  This evidence thus lacks probative value as to William's reliance on his brothers in entering into that 1983 agreement.  Furthermore, evidence that William sued his mother, even if such a suit had been brought prior to the 1983 SPA, demonstrates nothing about his attitude toward and reliance upon his brothers.  Because the contested evidence is irrelevant to the stated purposes for which it was offered, this court concludes that the district court erred in admitting it.

When a trial court erroneously receives evidence, this court will reverse the jury's verdict "only if the error prejudicially affects a substantial right of a party." *Sanjuan v. IBP, Inc.*, 160 F.3d 1281, 1296 (10th Cir. 1998).  This court deems such wrongly admitted evidence prejudicial only if we reasonably conclude that the jury would have reached a different result without that evidence.  *See id.* Having reviewed the transcript of this trial, this court cannot reasonably conclude that the jury would have found for the Plaintiffs had it not learned of these other lawsuits.  In the context of this eleven week trial, it is extremely doubtful that the lone, brief colloquy between defense counsel and William about suing his brothers and mother and one passing  mention of this evidence in the Defendants' opening statement caused the jury to find for the Defendants.  Therefore, although

the district court did err in admitting the disputed evidence, that error did not sufficiently prejudice the Plaintiffs to warrant reversal of the judgment.

### 2. *The Denial of Cross-Examination on Charles Koch's Character*

A number of defense witnesses, including Charles Koch himself, testified to Charles' honesty and integrity, as well as his positive management style. The Plaintiffs repeatedly sought to ask these witnesses whether in rendering their character opinions they knew about or considered certain instances which might call into question Charles' honesty. Specifically, the Plaintiffs wanted to ask about three such instances: (1) a United States Senate Report which detailed KII's widespread theft and fraudulent reporting practices in the 1980's; (2) a 1974 federal court decision finding KII liable for fraud; and (3) two 1997 retaliatory discharge and age discrimination lawsuits filed against KII.

The district court denied the Plaintiffs the opportunity to ask about these instances, concluding there was "little or no probative value" regarding Charles' honesty, and the danger of confusion, prejudice, and delay substantially outweighed the probative value. The Plaintiffs maintain the district court erred in precluding their cross-examination. This court will not reverse a district court's exclusion of evidence absent an abuse of discretion. *See Seymore*, 111 F.3d at 800.

In *Securities & Exchange Commission v. Peters*, this court held that the district court had abused its discretion in refusing to allow the SEC to ask, on cross-examination, both Peters and seven of his character witnesses whether they had heard about other fraud suits filed against him. 978 F.2d 1162, 1164 (10th Cir. 1992). The questions which the Plaintiffs in this case sought to ask, however, differ significantly from those at issue in *Peters*. In *Peters*, the SEC sought to test the accuracy of Peters' factual testimony and his witnesses' character testimony by asking if they were aware of two previous fraud suits brought *against Peters personally*. *See id.* at 1169. In contrast, these Plaintiffs undertook to challenge the character testimony by asking the witnesses if they had heard about instances of dishonesty *by KII, the corporation*, not by Charles Koch the individual.

Although the Plaintiffs maintain these instances of KII's dishonesty also implicate Charles' own trustworthiness, the nexus between KII's conduct and that of Charles in these instances is not nearly as strong as the Plaintiffs suggest. In its 1974 order finding KII liable for fraud, a federal district court may have noted some of Charles' activities within the company relevant to the fraud action, but it never concluded that he personally committed fraud. The Senate Report focuses almost entirely on the deceptive and illegal practices of KII, and, although the report does impliedly question the veracity of Charles' statements to committee

investigators, it does not explicitly state, as the Plaintiffs assert, that Charles lied. Finally, the retaliatory dismissal and age discrimination complaints name KII as the defendant and allege no wrongdoing whatsoever by Charles Koch; even had these complaints targeted Charles, this court fails to see how allegations of retaliation and age discrimination bear upon the alleged wrongdoer's honesty. This court thus agrees with the district court's conclusion that these instances have no real probative value regarding Charles' character for honesty.

The district court also did not abuse its discretion in determining the little probative value that these instances might have is substantially outweighed by the danger of unfair prejudice, confusion, and waste of time. This court has recognized that exclusion of evidence under Rule 403 is "an extraordinary remedy to be used sparingly" and reviews a district court's decision to do so for abuse of discretion. *K-B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1155 (10th Cir.1985) (quotation omitted). For the jury to properly assess the weight of this evidence, the court would have needed to allow both sides to explain how instances reflecting KII's dishonesty as a corporation might or might not implicate Charles' personal character for honesty. The district court, therefore, would have entertained a series of virtual mini-trials on these rather collateral events. Such diversions from the trial's focus would have wasted considerable time and potentially created unnecessary confusion in the minds of the jurors.

Because these instances of dishonesty at most only tangentially implicate Charles' own character and the jury could have become confused about the tenuous nature of this link, there existed a definite danger that this minimally probative evidence would unfairly prejudice Charles. Therefore, the district court did not abuse its discretion in excluding these questions under Rule 403.

D. Jury Instructions

For their Pine Bend claims, the Kansas Plaintiffs and the Texas Plaintiffs separately requested jury instructions on fraudulent misrepresentation which defined materiality under a subjective standard. The district court, however, denied these requests and instead gave instructions defining materiality in objective terms.[14] Both the Plaintiffs and the Texas Plaintiffs maintain on appeal that Kansas and Texas law define materiality subjectively. In addition, the Plaintiffs challenge the district court's instruction on fiduciary duty. Finally, the Texas Plaintiffs also appeal the district court's refusal to give instructions or

---

[14] The Plaintiffs' proposed instruction read: "A representation is material when it relates to some matter that is so substantial as to influence the party to [whom] it was made." The Texas Plaintiffs proposed the following: "You are instructed that a fact is material if the plaintiffs would not have entered into the stock transaction without such misrepresentations having been made or facts concealed." The district court, however, settled on this instruction: "A fact is material if a reasonable person would consider the fact important or significant in deciding whether or not to sell his or her shares."

submit a special verdict or a general verdict with interrogatories on their Texas common law constructive fraud and Texas Securities Act claims.

This court reviews jury instructions *de novo* and reverses only when deficient instructions are prejudicial.[15]  *See Coleman v. B-G Maintenance Management of Colo., Inc.*, 108 F.3d 1199, 1202 (10th Cir. 1997).  In assessing the propriety of jury instructions concerning state law claims, this court has a duty to apply state law as announced by the state's highest court.  *See Shugart v. Central Rural Elec. Co-op.*, 110 F.3d 1501, 1504-05 (10th Cir. 1997).  If, however, the state's highest court has not decided the issue presented, we may either certify the question to that court or predict how it would rule.  *See Fields v. Farmers Ins. Co.*, 18 F.3d 831, 834 (10th Cir. 1994); *Coletti v. Cudd Pressure Control*, 165 F.3d 767, 775 (10th Cir. 1999); 10th Cir. R. 27.1.  Furthermore, "this court must . . . follow any intermediate state court decision unless other authority convinces us that the state supreme court would decide otherwise." *Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1574 (10th Cir. 1984).

### 1.  Kansas Standard of Materiality

To support their contention that the proper definition of materiality under Kansas fraudulent misrepresentation law is a subjective one, the Plaintiffs rely on four Kansas cases and the Kansas Judicial Council's Pattern Instructions ("PIK").

---

[15]  *See infra* 66-68 (discussing the degree of prejudice warranting reversal).

The first two cases to which the Plaintiffs cite do not in fact recite any materiality definition. *See State ex rel. Stephan v. GAF Corp.*, 747 P.2d 1326, 1331 (Kan. 1987); *Dushane v. Union Nat'l Bank*, 576 P.2d 674, 678 (Kan. 1978). Although the Plaintiffs' next case, *Fisher v. Mr. Harold's Hair Lab, Inc.*, does state a subjective definition of materiality, several paragraphs later the court also articulates an objective standard. *See* 527 P.2d 1026, 1032 (Kan. 1974). It is only the Plaintiffs' final case, *McGuire v. Gunn*, which clearly defines materiality in subjective terms. *See* 300 P. 654, 656 (Kan. 1931). *McGuire*, however, has aged nearly seventy years, and the Kansas Supreme Court long ago ceased relying upon it,[16] instead now applying an objective standard. Finally, PIK Civ.3d 127.40 (1997), which the Plaintiffs maintain directs courts to issue an instruction defining materiality subjectively, speaks to this issue as inconsistently as *Fisher*. Although the proposed instruction states, "A representation is material when it relates to some matter that is so substantial as to influence the party to whom it was made," the comments following provide, "Materiality of representation is defined in *Griffith v. Byers Constr. Co.* . . . and *Timi v. Prescott State Bank* . . . ."

---

[16] The most recent Kansas appellate court opinion citing *McGuire* for its subjective materiality definition is *Fisher*, a 1974 case which, as noted above, simultaneously stated an objective standard of materiality. *See Fisher v. Mr. Harold's Hair Lab, Inc.,* 527 P.2d 1026, 1032 (Kan. 1974).

As discussed below, both *Griffith* and *Timi* unequivocally define materiality in objective terms.

This court has previously stated that in a fraudulent misrepresentation action pursuant to Kansas law, "A fact is material if it is one to which a reasonable person would attach importance in determining his or her choice of action in the transaction involved."[17] *City of Wichita v. U.S. Gypsum Co.*, 72 F.3d 1491, 1495 (10th Cir. 1996) (citing *Timi*, 553 P.2d at 325). Following the doctrine of *stare decisis*, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law. *Cf. Kinnison v. Houghton*, 432 F.2d 1274, 1277 (10th Cir. 1970) (concluding that the panel need not look to a Tenth Circuit opinion addressing state law which supported the appellant's position, because an intervening state court decision held to the contrary). Because the Plaintiffs have failed to alert us to any supervening Kansas decisions contrary to *U.S. Gypsum*'s reading of the materiality element in a Kansas fraud action, and we have located no such authority, this court is bound

_____

[17] The Plaintiffs contend this court, in another case, also applied a subjective definition of materiality under Kansas law. *Palmer Coal & Rock Co. v. Gulf Oil Co.*, however, simply quotes a district court's instructions which articulated the subjective standard, but does not itself endorse such an approach as the correct one. *See* 524 F.2d 884, 885 n.1 (10th Cir. 1975). The *Palmer Coal* court noted neither side objected to these instructions, thus verifying that it did not adopt the subjective standard in the instructions. *See id.* at 885.

by *U.S. Gypsum*'s conclusion that Kansas law defines materiality under an objective standard in a state fraud action.

Moreover, negotiating the labyrinth of Kansas jurisprudence confirms that the standard of materiality for fraudulent misrepresentation, as presently defined by the Kansas Supreme Court, is an objective one. In *Griffith*, a case involving an action for fraudulent concealment, the Kansas Supreme Court first indicated that such an action is governed by the identical legal standard as a fraudulent misrepresentation claim. *See* 510 P.2d 198, 205 (Kan. 1973). In defining materiality for such an action, the Kansas Supreme Court stated, "A fact is material if it is one to which a reasonable [person] would attach importance." *Id.*; *see also Timi*, 553 P.2d 315, 317, 325 (Kan. 1976) (defining materiality in the same terms in a fraudulent misrepresentation case). Indeed, in its recent review of a consumer protection action alleging illegal misrepresentation, the Kansas Supreme Court relied on *Griffith*'s objective definition of materiality. *See York v. InTrust Bank, N.A.*, 962 P.2d 405, 420 (Kan. 1998); *see also Farrel v. General Motors Corp.*, 815 P.2d 538, 548 (Kan. 1991). Furthermore, in discussing the elements of fraud by silence, the Kansas Supreme Court recently noted that a duty to disclose material facts only arises when the other party would *reasonably* expect disclosure. *See OMI Holdings Inc. v. Howell*, 918 P.2d 1274, 1300-01 (Kan. 1996). This court's review of Kansas law and binding Tenth Circuit

precedent thus leads to the conclusion that the district court properly instructed the jury on materiality under Kansas law.

## 2. Texas Standard of Materiality

In contrast, the Texas Plaintiffs correctly characterize as subjective the definition of materiality under their two distinct claims, i.e., Texas common law fraud and a violation of section 27.01 of the Texas Business & Commercial Code ("section 27.01").[18]  Although the Texas Supreme Court has not recently articulated a materiality definition for either of these two causes of action, numerous Texas Court of Appeals and Fifth Circuit opinions lead this court to agree with the position taken by the Texas Plaintiffs.  Discussing Texas common law fraud, the Texas Court of Appeals recently stated, "A misrepresentation is material if it induced the complaining party to enter into the contract." *Marburger v. Seminole Pipeline Co.*, 957 S.W.2d 82, 86 n.4 (Tex. App.1997, writ denied) *Marburger* simply follows a long line of cases establishing this subjective standard.  *See, e.g.*, *Hart v. Aetna Cas. & Sur. Co.*, 756 S.W.2d 27, 29 (Tex. App. 1988, no writ); *Sawyer v. Pierce*, 580 S.W.2d 117, 124 (Tex. App. 1979, writ ref'd n.r.e.); *Putnam v. Bromwell*, 11 S.W. 491, 492 (Tex. 1889).  Additionally,

---

[18]  Although the Defendants contend that the district court erred in its choice of law decision allowing the Texas Plaintiffs to proceed on two Texas state law claims, the Defendants nonetheless expressly waived review of that determination on appeal because they believe Kansas and Texas law do not differ on the issue.

the Fifth Circuit has noted that Texas common law fraud, unlike federal securities fraud, defines materiality in subjective terms. *See In re Sioux Ltd., Securities Litigation v. Coopers & Lybrand*, 914 F.2d 61, 65-66 (5th Cir. 1990), *implied overruling on other grounds recognized by,Pacific Mut. Ins. Co. v. First RepublicBank Corp.*, 997 F.2d 39, 41 (5th Cir. 1993). Indeed, a treatise on Texas law states the following:

> In order to constitute actionable fraud, representations must pertain to material facts . . . .
> The test for determining whether a represented fact is material relates to the effect of the representation on the transaction in question. . . .
> A representation is not material if it appears that the transaction would have been entered into notwithstanding the representation. On the other hand, a represented fact is said to be material if the transaction would not have been entered into had the representation not been made.

Elizabeth A. Wong, 41 Texas Jurisprudence, Fraud and Deceit § 13 (3d ed. 1998).

Admittedly, a few Texas cases have caused some confusion about the proper materiality standard under Texas common law fraud. Two recent Texas Court of Appeals cases each confusingly recite both an objective and a subjective materiality standard in a single sentence. *See Beneficial Personnel Servs. of Texas, Inc. v. Porras*, 927 S.W.2d 177, 186-87 (Tex. App. 1996, writ granted w.r.m.); *Beneficial Personnel Servs. of Texas, Inc. v. Rey*, 927 S.W.2d 157, 168 (Tex. App. 1996, writ granted w.r.m.). The objective language in these two cases is drawn from another case upon which the Defendants rely, which merely quoted

a trial court's instructions employing an objective standard but never affirmatively approved those instructions. *See American Medical Int'l, Inc. v. Giurintano*, 821 S.W.2d 331, 338 (Tex. App. 1991, no writ). No other case to which the Defendants cite suggests Texas common law fraud utilizes an objective definition of materiality.[19] *Porras* and *Rey* merely confuse the issue; they do not overrule earlier cases and they antedate *Marburger*. Therefore, this court is convinced that Texas common law fraud jurisprudence establishes a subjective standard of materiality.

Materiality under section 27.01 is also measured subjectively. As the Fifth Circuit noted, "Because the statute is derived from Texas common law fraud, the reliance and materiality elements of section 27.01 do not differ from those of Texas common law fraud." *Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014, 1025 n.4 (5th Cir. 1990); *see also Fisher v. Yates*, 953 S.W.2d 370, 380 n.7 (Tex. App. 1997, writ denied) ("The reliance and materiality elements of statutory fraud

---

[19] Like *American Medical*, *Miller v. Miller* merely notes a trial court's use of an objective definition in jury instructions without deciding the correctness of those instructions. *See* 700 S.W.2d 941, 948 (Tex. App. 1985, writ ref'd n.r.e.). *Bridwell v. State* addresses criminal fraud under the Texas Securities Act, not state common law fraud. *See* 804 S.W.2d 900, 904 (Tex. Crim. App. 1991, no pet.). *Shepard v. Rubin* never articulates a materiality definition, though it implicitly approves a subjective standard laid down in *H.W. Broaddus Co., Inc. v. Binkley*, an opinion adopted by the Texas Supreme Court. *See Shepard*, 462 S.W.2d 316, 320 (Tex. App. 1970, no writ); *Binkley*, 88 S.W.2d 1040, 1042 (Tex. Comm'n App. 1936). Finally, *American Tobacco Co. v. Grinnell* addresses the element of reliance, not materiality. *See* 951 S.W.2d 420, 436 (Tex. 1997).

[under section 27.01] do not differ from common law fraud."); Keith A. Rowley, *The Sky is Still Blue in Texas: State Law Alternatives to Federal Securities Remedies*, 50 Baylor L. Rev. 99, 124 n.104, 163 n.198 (1998) (noting that in contrast to an action under Texas Securities Act, an action pursuant to common law fraud or section 27.01 merely requires a subjective showing of materiality). The Defendants have failed to alert this court to any authority that treats section 27.01's materiality element as an objective one, and nor have we found any such authority. This court thus concludes that section 27.01 imposes a subjective standard of materiality.

Finally, the district court's incorrect jury instruction sufficiently prejudiced the Texas Plaintiffs to warrant reversal. This court recently noted its own conflicting precedent regarding the precise standard for reversal due to erroneous instructions. *See Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221, 1236-37 (10th Cir. 1999). *Coleman* and *City of Wichita v. U.S. Gypsum Co.* require reversal when a jury might have based its decision on an erroneous instruction, even if that possibility was very unlikely. *See Coleman*, 108 F.3d at 1202; *U.S. Gypsum*, 72 F.3d 1491, 1495 (10th Cir. 1989). An earlier case, however, indicated this court should only reverse when it is more likely than not that the erroneous instruction affected a substantial right of the appellant. *See United States Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1253 n.39 (10th

Cir. 1988), *implied overruling on other grounds recognized by*, *Anixter v. Home-State Production Co.*, 77 F.3d 1215, 1231 (10th Cir. 1996). *Morrison Knudsen* did not need to reconcile these differing standards. *See* 175 F.3d at 1237.

Again, we need not decide which of these competing standards controls, because the erroneous instruction here would require reversal under either approach. The district court's erroneous instruction on an essential element of the Texas Plaintiffs' fraud claims effectively directed the jury to ignore the Texas Plaintiffs' own testimony that they would not have entered into the SPA absent the Defendants' misrepresentations and omissions. Additionally, the Defendants failed to present any evidence contradicting the Texas Plaintiffs' testimony about their states of mind.[20] Even under the more burdensome *Touche Ross* standard, therefore, the erroneous instruction warrants reversal, because the error more than likely, if not necessarily, affected a substantial right of the Texas Plaintiffs, i.e., the right to have the jury even consider the primary and only direct evidence on the materiality element. The district court therefore committed reversible error

---

[20] The Defendants did present evidence indicating that a reasonable person would not have been affected by the alleged misrepresentations in deciding whether to enter into the SPA. Certainly such reasonable person evidence may be used to counter the Texas Plaintiffs' testimony because a jury could potentially discredit the Texas Plaintiffs testimony based on the unreasonableness of their assertions. Nonetheless, the Defendants presented no *direct* evidence that the Texas Plaintiffs ever said or believed anything contradicting their state-of-mind testimony.

with respect to the Texas Plaintiffs' claims when it instructed the jury to determine objectively whether the Defendants' misrepresentations and omissions were material.

### 3. Fiduciary Duty

Relying upon a 1986 order by the district court, the Plaintiffs proposed a jury instruction which stated, "The Court has found, as a matter of law, that a fiduciary relationship existed between the plaintiffs and the defendants." Over the Plaintiffs' objection, the district court instead instructed the jury as follows:

> To recover on their [fiduciary duty] claim, the plaintiff(s) have the burden of first proving, by a preponderance of evidence that is clear and convincing, that they did not voluntarily and intentionally relieve the individual defendant(s) of their fiduciary duty as directors or officers of Koch Industries. If you find the plaintiff(s) to have not met this burden of proof, then you shall find that the individual defendant(s) did not owe a fiduciary duty.
>
> If you find, however, the plaintiff(s) have proved that they did not relieve the defendant(s) of their fiduciary duty as directors or officers of Koch Industries, then it becomes the individual defendant(s)' burden to prove, by a preponderance of evidence that is clear and convincing, the following elements:
> (1) that concerning the alleged misrepresentations or omissions, the individual defendant(s) completely and truthfully disclosed to the plaintiff(s) or their agent(s) all relevant facts, known to the individual defendant(s) by reason of their office or position at Koch Industries and not known by the plaintiff(s) or their agent(s), that were material in affecting the value or price of the stock; and
> (2) that the plaintiff(s) were paid a fair price for their stock and that the terms of the transaction were fair, balanced against the best interests of the corporation and all of its shareholders.

In short, the first paragraph of this instruction required the jury to determine whether a fiduciary relationship actually existed; if the jury answered this predicate inquiry in the affirmative, it then needed to determine whether the Defendants in fact breached their fiduciary duty.

The verdict form, however, guided the jury directly to the second question, entirely ignoring the predicate inquiry of whether a fiduciary relationship existed. Question 6 on the verdict form stated, "Do you find on the fiduciary duty claim that the defendants have proved that they disclosed those material facts concerning Pine Bend Refinery to the plaintiffs which the plaintiffs or their agents otherwise did not know **and** that Koch Industries paid a fair price for the plaintiffs' stock?" The jury answered, "Yes."

The Plaintiffs appeal the district court's instruction requiring them to prove the existence of a fiduciary relationship, arguing that Kansas law imposes a strict fiduciary duty on corporate officers and recognizes no exception to this duty when a plaintiff may have relieved an officer defendant of that duty. As noted above, this court will reverse a district court judgment only when deficient instructions are prejudicial. *See Coleman*, 108 F.3d at 1202. Here, this court need not determine whether the challenged instruction constituted a proper statement of the law, because the verdict form rendered any possible error in the instruction harmless. Although the jury was told in the instructions that they would need to

first determine whether the Defendants had been relieved of their fiduciary duty, the verdict form never asked that question. Instead, Question 6 in the verdict form impliedly assumed that a fiduciary relationship existed and queried only whether the Defendants had proved they did not breach that relationship, to which the jury answered "yes." Because the verdict form never posed the challenged question to the jury but impliedly assumed the answer in favor of the Plaintiffs and the jury found for the Defendants on the breach inquiry, this court concludes any possible error in the district court's instructions on the existence of a fiduciary relationship was harmless. Due to this harmlessness, this court need not reverse the judgment under either the *Coleman/U.S. Gypsum* prejudice standard or that of *Touche Ross*, even if the challenged instruction was erroneous. *See Coleman*, 108 F.3d at 1202 (requiring reversal when a jury might have based its decision on an erroneous instruction); *U.S. Gypsum*, 72 F.3d at 1495 (following *Coleman* standard even if the possibility is very unlikely); *Touche Ross*, 854 F.2d at 1253 n.39 (requiring reversal only when it is more likely than not that an erroneous instruction was prejudicial).

### 4. The Texas Common Law Constructive Fraud Claims

Prior to submitting the case to the jury, the Texas Plaintiffs proposed instructions, definitions, and verdict questions on their Texas common law constructive fraud claims. Over their objection, however, the district court

refused to submit instructions or verdict questions to the jury relating to Texas constructive fraud. The court reasoned that those claims duplicated others and, alternatively, that the Texas Plaintiffs had failed to include a constructive fraud claim in the 1998 Pretrial Order.

In appealing the district court's decision, the Texas Plaintiffs maintain Rule 15(b) required the district court to amend the pleadings to include a constructive fraud claim. Their opening brief, however, does not offer any argument whatsoever that the Pretrial Order did in fact include a constructive fraud claim. The issue of the court's construction of the Pretrial Order is thus waived on appeal.[21] *See Johnson ex rel. Johnson v. Thompson*, 971 F.2d 1487, 1499 (10th Cir. 1992) (noting this court generally will not address issues that the parties failed to brief). Therefore, this court must only determine whether the district court properly declined to amend the Pretrial Order. We review that determination for an abuse of discretion. *See Trierweiler*, 90 F.3d at 1543.

Upon a party's motion, a trial court should amend the pretrial order to include issues not initially raised in that order but tried by express or implied

---

[21] In the Texas Plaintiffs' Reply Brief, they argue "the phrase 'common law fraud' used in the complaint and pretrial order includes constructive fraud under Texas law." They never raised this argument, however, in their opening brief, and this court need not entertain an argument raised for the first time in a reply brief. *See, e.g., Coleman v. B-G Maintenance Management of Colo., Inc.*, 108 F.3d 1199, 1205 (10th Cir. 1997).

consent of the parties. Fed. R. Civ. P. 15(b). A trial court should find such implied consent either when the consenting party introduces evidence on the new issue or fails to object when the other party introduces such evidence. *See Hardin*, 691 F.2d at 457. This court, however, has determined that "[w]hen the evidence claimed to show that an issue was tried by consent is relevant to an issue already in the case, and there is no indication that the party presenting the evidence intended thereby to raise a new issue, amendment may be denied in the discretion of the trial court." *Id.* The Texas Plaintiffs fully concede that the evidence presented at trial to support a constructive fraud claim precisely matched that evidence relevant to several of their other claims. Therefore, the Defendants did not impliedly consent to the trial of constructive fraud, and the district court acted well within its discretion in declining to amend the pretrial order to include an admittedly duplicative claim.

### 5. *Texas Securities Act Claims*

Similarly, the district court refused to submit to the jury the Texas Plaintiffs' Texas Securities Act claims. The district court determined the Act required proof that the stock at issue no longer exists and no such evidence had been presented to support that requirement. On appeal, the Texas Plaintiffs argue the district court improperly construed the statute. They acknowledge, however,

that their appeal on this issue depends upon this court's concluding the materiality element of fraud under the Texas Securities Act is a subjective one.

Unlike actions under Texas common law fraud or section 27.01,[22] however, a fraud claim pursuant to the Texas Securities Act does require proof of objective materiality. Most recently, the Texas Court of Appeals stated that under the Texas Securities Act "an omission or misrepresentation is material if there is a substantial likelihood that *a reasonable investor* would consider it important in deciding to invest." *Weatherly v. Deloitte & Touche*, 905 S.W.2d 642, 648-49 (Tex. App. 1995, writ dism'd w.o.j.) (emphasis added); *see also Anheuser-Busch Companies v. Summit Coffee Co.*, 858 S.W.2d 928, 936 (Tex. App. 1993, writ denied) (same), *vacated on other grounds* 514 U.S. 1001 (1995); *Granader v. McBee*, 23 F.3d 120, 123 (5th Cir. 1994) (same). Indeed, one commentator explicitly noted that materiality is defined objectively under the Texas Securities Act, but subjectively under Texas common law fraud and section 23.01. *See* Keith A. Rowley, *The Sky is Still Blue in Texas: State Law Alternatives to Federal Securities Remedies*, 50 Baylor L. Rev. 99, 121 n.104, 163 n.198 (1998). The Texas Plaintiffs have cited no authority suggesting a subjective materiality standard under the Texas Securities Act, and this court has found none. Therefore, because materiality is defined objectively under the Texas Securities

---

[22] *See supra* Section III.D.2.

Act and the jury found the Defendants' omissions and misrepresentations were not objectively material, the district court's refusal to submit Texas Securities Act claims to the jury, if error, was harmless.

E. District Court's Limitations on Plaintiffs' Fraud Claims

*1. The Rule 9(b) Order*

The Plaintiffs' Fifth Claim for Relief in their Amended Complaint pleaded fraud by the Defendants. Specifically, the fraud claim alleged that the Defendants misrepresented and concealed information about three particular KII assets–Koch Qatar, Inc., the Capa Madison Unit, and the Bates & Reimann wells. In addition, the fraud claim incorporated an allegation contained in paragraph twenty-two of the Amended Complaint, which broadly stated,

> during 1982 and continuing to the present time, defendants planned and acted to conceal the true value of shares of stock in Koch Industries from plaintiffs and the other selling shareholders and carried out a scheme designed to understate the existence, extent and value of property and assets owned directly or beneficially by Koch Industries by failing to disclose the existence, location, ownership, condition and true value of assets and property, including, but not limited to, oil and gas reserves, acreage, prospects and properties, oil and gas production and planned development of oil and gas properties owned or acquired prior to June 10, 1983.

In an October 17, 1985 order, the district court limited the Plaintiffs' fraud claims to those allegations concerning the three specifically referenced assets, determining that the broad allegation contained in paragraph twenty-two did not

-74-

satisfy the particularity pleading requirement of Federal Rule of Civil Procedure 9(b). The district court went on to grant the Defendants summary judgment on the causes of action regarding two of the three assets–Koch Qatar, Inc. and the Bates & Reimann wells. The Plaintiffs now challenge the district court's Rule 9(b) ruling restricting the Plaintiffs' fraud claims.[23]

This court reviews a district court's Rule 9(b) ruling *de novo* and confines its analysis to the text of the complaint. *See Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1251 (10th Cir. 1997). Rule 9(b) provides, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally." Fed. R. Civ. P. 9(b). More specifically, this court requires a complaint alleging fraud to "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Lawrence Nat'l Bank v. Edmonds (In*

---

[23] In addition to the district court's October 17, 1985 ruling, the Plaintiffs challenge two later orders of the district court, issued on October 24, 1991 and June 30, 1992, which they also claim constituted dismissals of allegations under Rules 9(b) and 8. Although the October 24 order did reference Rule 9(b), it concerned discovery requests by the Plaintiffs, not dismissals of allegations or claims. Thus, this court will discuss the propriety of that order in the following section of this opinion dealing with discovery. *See infra* Section III.E.2. The June 30 order addressed the Plaintiffs' motion to amend their Second Amended Complaint, and the district court did not rely at all on Rule 9(b) or Rule 8 in denying some of the proposed amendments.

*re Edmonds)*, 924 F.2d 176, 180 (10th Cir. 1991).  Rule 9(b)'s purpose is "to afford defendant fair notice of plaintiff's claims and the factual ground upon which [they] are based. . . ." *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 987 (10th Cir. 1992) (quotation omitted), *implied overruling on other grounds recognized by*, *Seolas v. Bilzerian*, 951 F.Supp. 978, 981-82 (D.Utah 1997).

Here, the broad allegation in paragraph twenty-two of the Plaintiffs' Amended Complaint, which the district court found insufficient under Rule 9(b), set forth none of the specific and required allegations.  The statement  that the alleged misrepresentations were made "during 1982 and continuing to the present time" does not alert the Defendants to a sufficiently precise time frame to satisfy Rule 9(b).  Furthermore, paragraph twenty-two fails to mention at all the place at which any misrepresentations were made.  In addition, this paragraph specifies nothing about the content of the alleged misrepresentations, instead reciting a general statement that the Defendants "fail[ed] to disclose the existence, location, ownership, condition and true value of [KII] assets and property."  Finally, paragraph twenty-two failed to identify any specific Defendant who made these alleged fraudulent misrepresentations or omissions, a particularly important requirement in this case because of the number of individual defendants involved.

The Plaintiffs cite *Scheidt v. Klein*, 956 F.2d 963 (10th Cir. 1992) for the proposition that Rule 9(b) particularity requirements are relaxed when the facts supporting a fraud claim are within the opponent's knowledge and control. *Scheidt*, however, is not so generous. It merely holds that "[a]llegations of fraud may be based on information and belief when the facts in question are peculiarly within the opposing party's knowledge and the complaint sets forth the factual basis for the plaintiff's belief." *Id.* at 967. Unlike the complaint in *Scheidt*, paragraph twenty-two did not state that the Plaintiffs' allegations of fraud were based on information and belief, nor did it set forth any factual basis to support such a belief. Instead, paragraph twenty-two broadly alleged that the Defendants concealed the true value of KII stock without informing the court or the Defendants of the source for this contention. Moreover, the information and belief allegations in *Scheidt* concerned the intent or purpose of the defendants' actions, elements which this court noted were allowed to be pleaded generally under Rule 9(b). *See id.* Paragraph twenty-two, however, does not address intent or purpose, and thus Rule 9(b) does not excuse the generality of the Plaintiffs' allegations. Therefore, the district court properly precluded the Plaintiffs from pursuing fraud claims based on the broadly stated allegations of paragraph twenty-two.

### 2. *The Discovery Rulings*

After substantial but unsuccessful efforts by the Plaintiffs to litigate the claims stricken by the Rule 9(b) decision, the district court granted them leave to file a Second Amended Complaint and determined that document to be the one measuring the relevance of discovery requests. The Plaintiffs then issued subpoenas for production of documents from six different banks requesting all documents relating to any loans or transactions with KII between June 1, 1978 and June 30, 1988. In two separate orders, a federal magistrate judge limited this discovery request to those documents relating only to "the Pine Bend Refinery, the Pouce Coupe, Gilt Edge and Cold Lake properties in Canada, the equity value of ABKO, and the alleged understated value of certain assets because of financial and accounting policies and practices." The Plaintiffs also subpoenaed from the Ryder Scott Company all records of KII's oil and gas reserves for the years 1980 through 1988. A federal magistrate judge also limited this discovery to those documents concerning four KII assets–the Pouce Coupe, Gilt Edge, Cold Lake and Capa Madison properties.

The district court then affirmed the magistrate's decisions in its own order of October 24, 1991. In so ruling, the district court first determined that paragraphs thirty-eight and forty-six of the Plaintiffs' Second Amended Complaint did not delineate allegations of financial impropriety with sufficient particularity under Rule 9(b) "to justify discovery into all accounting documents

and practices of Koch Industries during the relevant time period." Additionally, the district court reasoned that even under the Plaintiffs' breach of contract and breach of fiduciary duty claims, Rule 26 barred the requested discovery because the burden and expense of producing these documents far outweighed the Plaintiffs' mere hope that they might find something upon which to base a claim. The Plaintiffs challenge the district court's orders limiting their discovery attempts.

This court reviews discovery rulings for an abuse of discretion. *See Pippinger v. Rubin*, 129 F.3d 519, 533 (10th Cir. 1997). Rule 26(b) provides, "Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . . The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Despite this broad language, the rule does allow a court to limit discovery if "the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(2)(iii). Indeed, the 1983 and 1993 Advisory Committee Notes indicate this sub-section was added "to encourage judges to be more aggressive in identifying and discouraging discovery overuse" and "to enable the court to keep tighter rein on the extent of discovery."

The Plaintiffs attempted to justify their extraordinarily expansive discovery requests as relevant to two broad, non-specific allegations contained in their Second Amended Complaint.[24]  When a plaintiff first pleads its allegations in entirely indefinite terms, without in fact knowing of any specific wrongdoing by the defendant, and then bases massive discovery requests upon those nebulous allegations, in the hope of finding particular evidence of wrongdoing, that plaintiff abuses the judicial process.  That is what occurred here.  The limits which Rule 26(b)(2)(iii) place upon discovery are aimed at just such a tactic. Utilizing its discretionary power under this rule, the district court appropriately recognized that the likely benefit of this attempted fishing expedition was speculative at best.  Furthermore, the district court understood that to require the six banks and the Ryder Scott Company to produce the massive amount of documents requested, first weeding out privileged and confidential records, would impose a serious burden and expense upon these non-parties.  The district court thus properly determined that the burden and expense of these discovery requests far outweighed their likely benefit.  Therefore, this court concludes the district court did not abuse its discretion in limiting the Plaintiffs' discovery.

---

[24]  Both paragraphs thirty-eight and forty-six contained broad allegations that the Defendants did not provide financial information to the Plaintiffs in accord with GAAP.  Paragraph forty-six recited one specific example of these alleged accounting improprieties relating to the Pine Bend Refinery.

F. The District Court's Administration of this Case

The Plaintiffs contend the district court administered this case unjustly. They first assert the district court harbored an unfair disdain for the Plaintiffs which led the court to oversee the case in a biased fashion. The Plaintiffs then list a number of the district court's rulings which were unfavorable to them as evidence of the court's "harsh, lopsided and manifestly unjust" treatment.

To the extent that some of the specified rulings were contested in greater depth in previous sections of the Plaintiffs' brief, this court has already disposed of those arguments. Furthermore, the Plaintiffs cite no legal authority at all in contesting other rulings which they failed to address in prior portions of their brief, thus waiving these arguments on appeal. *See Adler*, 144 F.3d at 679 (noting that "[a]rguments inadequately briefed in the opening brief are waived"). Finally, at no point during the litigation did the Plaintiffs seek to have the district court judge disqualified on the basis of bias or on any other grounds. The Plaintiffs thus waive their bias argument on appeal because they failed to timely move for disqualification. *See United States v. Stenzel*, 49 F.3d 658, 661 (10th Cir. 1995). Therefore, this court concludes none of these arguments warrants reversal.

G. Damages

Finally, the Plaintiffs assert the district court erroneously limited their damages, arguing that their Section 10(b) and Rule 10b-5 claims warranted a more liberal measure of damages than allowed by the court. Because the jury found for the Defendants and, with the exception of the Texas Plaintiffs' state common law and statutory misrepresentation claims, this court now affirms each of the district court's rulings which the Plaintiffs challenge, we need not address this issue.

H. Motion to Correct Misstatements at Oral Argument

The Plaintiffs have filed a motion under Federal Rule of Appellate Procedure 27 to correct alleged misstatements by defense counsel at oral argument. Rather than a Rule 27 motion, the Plaintiffs' filing constitutes an additional six pages of briefing on the merits, which in turn inspired a response from the Defendants amounting to twelve more pages of such briefing. Not to be outdone or, in the alternative, to equalize the pages of briefing on the merits under the guise of the Rule 27 motion, the Plaintiffs then filed a six page reply.

One thing this court did not need in this case was further briefing and argument. The court previously demonstrated leniency in allowing the filing of oversized briefs pursuant to Federal Rule of Appellate Procedure 28(g) and Tenth Circuit Rule 28.3 and by granting additional time for oral argument. Regarding

the Plaintiffs' substantive claims in this motion, while it is true that one of the statements challenged is a misstatement, defense counsel did not make the utterance maliciously nor did he mislead the court. Most disturbingly, the Plaintiffs' motion reveals their apparent assumption that the court does not read the record to confirm or refute representations as to its content. That assumption is wrong.

The Plaintiffs' motion is denied as an inappropriate attempt to circumvent Federal Rule of Appellate Procedure 28(c), which states, "Unless the court permits, no further briefs [beyond the reply brief] may be filed." Fed. R. App. P. 28(c).

## IV. CONCLUSION

In deciding the instant appeal, this court has reviewed a piece of litigation spanning a decade and a half and a trial lasting nearly three months. This court is well aware that in such litigation the discretion of the trial court is important to accomplish efficiency, notice, and fairness. In this context, however, we could not reasonably expect perfection in the district court's exercise of that discretion or in its overall handling of the case; rather, what this court expects from the district court is basic fairness to all parties. Having reversed the district court on but two of many issues presented on appeal, we are satisfied that the district court

achieved fundamental fairness in its presentation of this vast and complex piece of litigation to lay fact finders.

This court hereby **AFFIRMS** the judgment of the United States District Court for the District of Kansas, except as to the Texas Plaintiffs' claims under state common law fraud and section 27.01 of the Texas Business & Commercial Code. Regarding those two claims, this court **REVERSES** and **REMANDS** for proceedings consistent with this opinion.

APPENDIX

Following is a list and discussion of the evidence which this court considered in determining whether the district court erroneously granted summary judgment on the Plaintiffs' 175,000 B/D expansion claim:

• A 12/13/82 letter from Keith Bailey, President of Williams Pipeline, to J.W. Moeller, Vice President of KII, stating, "As you know, time is growing short if we are to have an expansion in place by mid-1983." This letter undoubtedly refers to the 145,000 B/D expansion, not the 175,000 B/D expansion idea, as even Plaintiffs allege the larger expansion was not intended for completion until the end of 1985 while KII aimed to complete the 145,000 B/D expansion by mid-1983.

• A 1/6/83 letter from KII's Vice President of Planning to Williams Pipeline, stating, "Due to Koch Refining's current and planned future expansion of our Pine Bend Refinery . . . Koch Refining and Williams Pipeline management have been discussing several plans to increase current pumping capacity into the Williams system." Given the date of this letter, the "current expansion" language must refer to the 145,000 B/D expansion. The "planned expansion" wording, however, is not expressly clear as to whether it refers to a 155,000 B/D or a 175,000 B/D expansion. Reading this document in the context of the other evidence, however, leads this court to conclude this language must refer to the

lesser expansion, inasmuch as there is no evidence that as of January 6, 1983 KII had even started discussions with Litwin Engineering about a potential 175,000 B/D expansion.

• 1/20/83 Litwin Engineering notes from a meeting with KII representatives, stating,

> 1. The purpose of the meeting was to establish a basis for design to expand Koch's St. Paul Refinery No. 1 Crude Unit to 65,000 BPD. The unit presently operates at approximately 39,000 - 40,000 BPD. Koch is currently making modifications which will increase capacity to approximately 50,000 BPD.
> 2. Target for processing 65,000 BPD would be start of summer, 1984.

These notes indicate that prior to the SPA, KII had inquired of Litwin about possible designs for Unit 1 which would enable that unit to process 65,000 B/D. KII was therefore at least considering such an expansion prior to the SPA. These notes do not suggest, however, that KII had contracted with Litwin to do actual design work required for the expansion or that KII had committed in any way to effectuating the expansion.

• an undated Litwin Proposal, stating the following:

> Litwin will provide engineering and estimating services to provide Koch Refining Co. with comparative budget cost estimates of 1) expanding Koch's existing St. Paul Refinery No. 1 Crude Unit from the present operating capacity of 40,000 BPSD to 65,000 BPSD and
> 2) constructing a new 65,000 BPSD Crude Unit at the same facility.
> Litwin's initial emphasis will be the review of two cases of a 1979 study for expanding Koch's St. Paul No. 1 Crude Unit.

. . .
Litwin anticipates completion of this work approximately five weeks after release by Koch.

This likely was written shortly after the January 1983 meeting with KII representatives. The Proposal, however, manifests only the internal dynamics of Litwin regarding what it would do to study the potential expansion.

- a 2/1/83 Proposal from Litwin to KII:

    Litwin proposes to provide process and mechanical engineering and cost estimating services to compare [1.] expansion of the No. 1 Crude Unit from 40,000 BPSD to 60,000 BPSD, [2.] expansion of the No. 1 Crude Unit from 40,000 BPSD to 65,000 BPSD, and [3.] construction of a new 65,000 BPSD Crude Unit.
        . . .
    Litwin will review and update . . . two cases of its 1979 study for expansion of the No. 1 Crude Unit. . . .
    This proposal is valid for acceptance on or before February 15, 1983
    . . . .

This document appears to be a contract offer from Litwin to KII. Like the prior undated proposal, this document reveals Litwin's offer to engage in these studies but not KII's commitment to the studies or the actual expansion.

- 1/31/83; 2/3/83; 2/14/83 calculations by Litwin employees. These calculations were performed internally by Litwin and there is no direct evidence that they ever reached the eyes of KII representatives. This work, however, may imply that KII had in fact accepted Litwin's proposal to study these design options for the 175,000 B/D expansion. Alternatively, these calculations may

merely suggest Litwin's dogged and hopeful pursuit of a contract which KII had not yet accepted. At most, however, this work merely evidences that KII was studying the expansion option, but not that KII had committed to it.

• 3/4/83 Project Notes for internal use only, written by L.J. Ross of Litwin, stating, "Attached is a marked-up Equipment Summary for both the 60,000 BPSD and 65,000 BPSD Crude Unit Expansion . . . ." Again, while one might infer from these notes that KII had engaged Litwin to study these two options, there remains no evidence KII saw these notes or that the matter progressed to a planned expansion.

• an 8/3/83 unsigned memorandum entitled "Crude and Hydrotreater Expansion - Pine Bend," which states, "We propose to utilize an existing FCC Preheater and add a Preflash Tower to increase our No. 1 Crude Unit capacity to 65,000 B/D. This plus 110,000 B/D capacity of the No. [2] crude unit . . . will give us a total of 175,000 B/D crude capacity." The words "our No. 1 Crude Unit" indicate a KII employee drafted this memorandum. The document, however, merely proposes this expansion option. It does not demonstrate that KII was actually planning to execute this expansion.

• 8/9/83 Litwin Conference Notes from a meeting with J. Johnson of KII, stating, "Litwin is to present Koch with the cost and time required to prepare a process package with major equipment specifications for a new 65,000 BPD Unit

and Splitter Tower at the St. Paul Refinery." These notes provide fairly strong inferential evidence that KII had not accepted Litwin's earlier contract offer of February 1, 1983. If KII had accepted that offer, these cost estimates would have been prepared much earlier.

• 8/19-20/83, KII Board of Directors Meeting Supplemental Information, stating "Analysis of the expansion of Pine Bend crude and desulfurization capacity have been underway for some time. . . . Design and optimization of equipment of the two desulfurizers and the crude expansion are in progress. . . . [A]pplication for the crude expansion permit will be submitted in September. Final cost estimates, LP optimizations and economics are being prepared." In a chart on the following page, titled "Pine Bend Expansion Comparison," the number 157.5 appears as the "total" under the column for "Expansion Case (MB/D)." The first two statements in the Board notes must refer to the 155,000 B/D expansion, given the on-going nature of the stated expansions and the numbers on the following page. The statement regarding the permit, however, could possibly refer to an expansion beyond 155,000 B/D. Nonetheless, it is significant that KII did not apply for a permit which might have pertained to a 175,000 B/D expansion until September 1983.

• a 9/26/83 Memo from KII employee T.W. Segar to KII President Bernard Paulson, stating, "1. Koch presently has a refinery capacity of 137,000 B/D crude

oil and is operating at or near maximum.  2. Expansion plans are to add a third crude unit of 70,000 B/D to raise design capacity to 207,000 B/D."  This memo indicates KII may have abandoned all of the options for expansion to 175,000 B/D studied by Litwin, opting instead for a more aggressive expansion plan. Thus, this document constitutes evidence of KII's tentative approach, as of June, 1983, to a possible 175,000 B/D expansion, something less than "making plans."

• a 10/13/83 Memo Sheet from First National Bank of Chicago's Annual Review of Koch, which states, "Koch is considering expanding the [Pine Bend] refinery to 175,000 BPD and 'exporting' the additional product into Chicago, Des Moines, and Kansas City areas to take advantage of the markets formerly served by refineries which have closed."  This reference to the 175,000 B/D is inconsistent with the prior document (the 9/26/83 memo), but perhaps First Chicago was relying on older information.  More significantly, KII apparently was telling First Chicago in October 1983 that it was merely "considering" this expansion possibility.

• on 11/16/83, KII publicly announced its plan of adding a third crude unit to expand to 207,000 B/D.  Again, this commitment to a more aggressive expansion indicates KII had abandoned the two options which Litwin investigated that would have increased Pine Bend's crude production to a mere 175,000 B/D.

• 12/8-9/83 KII Board of Directors Meeting Supplemental Information:

At the August 1983 Board Meeting, a combined project to expand Pine Bend Crude capacity to 175 MB/D and construct two 10 MB/D hydrotreaters using equipment purchased from Sohio was presented. Several significant changes have occurred since August and the current status of the project is discussed below.
. . .
Modifications to the [No.] 2 crude unit during the September turnaround has increased crude capacity to 155 MB/D. . . . Although a crude expansion still appears to be economically attractive, additional analysis is required due to the reduced Canadian crude availability and expanded base capacity.

In November, permit application was made to the Minnesota agencies for construction of a 70 MB/D grass roots crude unit in order to expedite permitting, which normally requires approximately one year to complete. Currently, two cases are being evaluated: (1) Expand the [No.] 1 crude unit from 40 MB/D to 70 MB/D and (2) Construct a new 70 MB/D crude unit and shut down the [No. 1] crude unit. The permit application would be adequate for either alternative.
. . .
Major efforts currently are directed toward attaining the permits necessary to expand the crude unit. Analysis is progressing on the two alternate cases under various crude availability and product marketing scenarios.

This discussion apparently revives consideration of the Litwin options, or perhaps these options never were abandoned, despite the implications of earlier documents. As of December 1983, however, the 175,000 B/D expansion option was still mired in the "analysis" stage and KII simply was continuing to explore this possibility.

• 2/21/84, Fourth Quarter Report from Bernard Paulson: "We have applied for permits to increase our permitted capacity to crude to 200,000 B/D and expect it to take over a year to secure the permit. We would plan to be running to

-7-

170,000 B/D in 1986." At this stage, some eight months following execution of the SPA, KII was indeed making plans for an interim expansion at least approaching 175,000 B/D with an ultimate expansion to approximately 200,000 B/D.

• 3/6/84 KII Inter-company notes, stating, "Bernie Paulson in charge of Refineries stated that in 1983 the Pine Bend Refinery had a capability of handling 138,000 barrels of crude oil and in 1984 that would increase to 152,000 barrels per day with the goal of being 170,000." Again, it seems that now KII had made a more definite commitment to the nearly 175,000 B/D expansion. These references to 170,000 B/D, however, do cast doubt on KII's pre-SPA level of commitment to the 175,000 B/D expansion possibility.

• 5/7/84, First National Bank of Chicago's Annual Review of KII: "Also under consideration are the replacement of the No. 1 crude unit for efficiency and the expansion and revamping of the fluid unit." Contrary to the prior two documents, this review indicates that as late as May of 1984 KII was still only "considering" this expansion.

• In Bernard Paulson's deposition testimony, he stated,

We did have Litwin review the possibility of expanding the No. 1 crude unit. . . . It was a rather short cursory look at it, this is January 26, I assume the latter part of '82. I don't think they spent a lot of time at it. . . . [W]e did not do it and rejected it I think because it was too much money, you know, it was not effective."

-8-